******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

ECKER, J., dissenting. Negligence liability for municipal employees is effectively dead. The doctrinal demise has occurred as the result of an accumulation of cuts inflicted by this court, on a case-by-case basis, over the past thirty years. In that sense, today's decision is merely one more unfortunate chapter in a story nearing its now-predictable end. But the majority's holding also does new damage. For the first time in Connecticut's history, and in direct contravention of numerous statutes reflecting our legislature's opposite policy choice, the majority extends immunity to municipal employees whose negligent operation of a motor vehicle on a public road has caused bodily injury or death. This opinion registers my objection to both the general trend and the additional step taken by the court today, which, in my view, further eviscerates a doctrine that, as codified in 1986; see Public Acts 1986, No. 86-338, § 13 (P.A. 86-338), codified as amended at General Statutes § 52-557n; had routinely imposed tort liability on municipal employees for personal injuries caused by their on-the-job negligence.

In broad perspective, these recent developments in the law of municipal immunity reflect a flawed jurisprudence that unnecessarily and unjustifiably denies legal recourse to many individuals who sustain actual physical harm as a result of a municipal employee's negligent conduct. Of particular concern to me is that the nearly unlimited reach of the current, judge-made, municipal immunity doctrine is of recent vintage, which is to say that (1) the current law of municipal employee immunity[1] bears only a slight resemblance to the law that was codified by the legislature in 1986 in P.A. 86-338, and (2) the developments since the 1986 codification are not the result of legislative policymaking. The reality is that the scope of immunity for municipal employees has expanded radically since 1986 without any basis in the governing statute, § 52-557n.

This opinion summarizes where we are and how we have reached this unfortunate state of affairs. Part I provides a brief historical overview of the doctrine of municipal employee immunity, both common-law and statutory, and offers a general critique of the changes we have made over the past three decades. Parts II and III examine the doctrinal expansion produced by the majority in the present case, which, in my view, warrants criticism in its own right and marks a milestone in the judicial eradication of municipal employee negligence liability.

The impact of today's decision is especially profound because it is double-fisted. One blow is dealt because the majority creates a new zone of immunity that did not exist and that was never intended by the legislature

when it enacted § 52-557n in 1986, namely, immunity for injuries caused by the negligent driving of a municipal police officer during a vehicular pursuit on public roadways. Immunity for negligent driving—routine or emergency—has *never* been available to municipal employees in Connecticut. As discussed in part II of this opinion, the majority's holding actually reverses existing law and overrules established doctrine in the particular context of emergency vehicle operation. See *Tetro* v. *Stratford*, 189 Conn. 601, 609–10, 458 A.2d 5 (1983) ("[w]e . . . conclude that [General Statutes] § 14-283 [which governs the rights and duties of emergency vehicles on public roadways] provides no special zone of limited liability once the defendants' negligence has been established [in connection with a police vehicular pursuit]"); *Voltz* v. *Orange Volunteer Fire Assn., Inc.*, 118 Conn. 307, 310, 172 A. 220 (1934) ("[The defendants' immunity] claim involves a misconception of the doctrine of governmental immunity . . . . The driver of a fire truck is liable to one injured by his negligent driving, though the municipality employing him is exempt from liability."). The majority's analysis also fails to come to terms with the express legislative command contained in the specific statute, § 14-283, governing the very municipal activity at issue in the present case, i.e., the operation of emergency vehicles on public roadways. Section 14-283 (d) plainly and unambiguously retains the long established negligence liability of the municipal employee in this context by providing expressly that the vehicle's emergency status "shall not relieve the operator . . . from the duty to drive with due regard for the safety of all persons and property." That duty has *never* been considered "discretionary," and the majority's decision to label it as such disregards the legislature's affirmation of the mandatory nature of the duty, even under emergency conditions.

Part III of this opinion addresses the second blow struck by the majority opinion, which effectively does away with the identifiable victim, imminent harm exception to municipal employee immunity in all cases outside of the public school context. The line drawn by the majority is arbitrary and bears no connection to any legitimate, or even articulable, underlying purpose. The present case presents a paradigmatic example of identifiable persons being exposed to the risk of imminent harm. In light of the legislature's codification of the doctrine in § 52-557n, we are no longer free to change or contract the scope of that doctrine when the outcome it produces is not to our liking.

I

A

I begin with the larger picture because the best way to appreciate what has gone wrong in the field of municipal employee negligence law over the past three decades is first to describe the current state of the law

and then to examine how we arrived here. The standard narrative appearing in our more recent cases views the current doctrine of near-total immunity as an unadulterated continuation of an old and deeply rooted common-law tradition, in which a municipality and its employees always have been immune from liability for negligence flowing from an employee's performance of routine, discretionary tasks.[2] The broad immunity conferred under the common law, the story goes, ultimately was codified by the legislature in § 52-557n. We have explained that, since the 1986 codification, our cases have merely implemented the municipal immunity doctrine as codified, without material modification. In other words, we say that our judicial decisions do not make new law but merely reflect the legislative will, as established in 1986, which, in turn, reflected the accumulated wisdom of long established common-law rules.[3]

This story is substantially inaccurate. It ignores the leading role that we have played in the expansion of municipal immunity since 1986 and belies our repeated insistence that, "[s]ince the codification of the common law under § 52-557n [in 1986], this court has recognized that it is not free to expand or alter the scope of governmental immunity therein." *Durrant* v. *Board of Education*, 284 Conn. 91, 107, 931 A.2d 859 (2007); see footnote 3 of this opinion. I do not intend any criticism of our court for "activism" in this regard. I believe that, in an age of statutes, there remains a vital judicial role to fill, in case-by-case adjudication, the numerous gaps, interstices, and ambiguities that emerge as legislative designs meet the infinitely varied and unpredictable conditions of the real world. See B. Cardozo, The Nature of the Judicial Process (1921) pp. 15–17, 113–115, 129; E. Peters, "Common Law Judging in a Statutory World: An Address," 43 U. Pitt. L. Rev. 995, 1002–1005 (1982); R. Traynor, "Statutes Revolving in Common-Law Orbits," 17 Cath. U. L. Rev. 401, 401–402 (1968). Rather, I take issue with the fact that we have failed, in my view, to perform that necessary analysis in a manner consistent with the guidance provided by historical precedent, legislative intentions, and relevant public policy. I also regret that we too often attribute our holdings to the very historical and legislative sources that our analysis contravenes.

As a starting point, the public is entitled to a candid assessment of the chances that a person today will succeed in a negligence lawsuit brought against a municipality or municipal employee for that employee's negligence.[4] The odds are close to zero.[5] This is true even in cases in which the negligence is manifest, the causation is direct, and the harm to person or property is serious. I put the odds at close to zero rather than completely hopeless because a plaintiff still stands a modest chance of success if she is a child injured on school premises under certain limited conditions,[6] and, on exceedingly rare occasions, a nonstudent plaintiff

may avoid the immunity bar by fitting within the narrow proprietary function exception under § 52-557n (a) (1) (B) or one of the special exceptions expressly enumerated in § 52-557n (b).[7] But, in the vast majority of cases, a negligence claim against municipal defendants is doomed from the outset under our current case law.

Indeed, it is difficult to overstate the breadth of the municipal immunity doctrine under our more recent cases. A plaintiff will lose her case under current law, even if the long-standing and on-point precedent of this court had refused to confer such immunity, and even in the absence of any indication that the legislature disapproved of that precedent.[8] In the same spirit, another recent judicial innovation changed *who* decides whether municipal immunity applies in any particular case. This latter development evolved gradually from 1988 until its consummation last year, when we expressly overruled a long line of precodification cases holding that the immunity issue ordinarily is for the jury.[9] Most of this court's other postcodification innovations have involved, in one way or another, the ever-expanding application of the so-called discretionary function doctrine to now include virtually every imaginable act or omission by virtually every municipal employee; we now have reached the point—*for the very first time in Connecticut's history*—when it is almost impossible to prevail against a municipal defendant in a negligence action for personal injuries or property damage. It has recently become as difficult to obtain tort compensation for damages caused by a municipal employee's garden-variety negligence as it is to obtain a court order granting the extraordinary writ of mandamus against a judicial officer or other public official.[10] Almost every such negligence claim under our new, judge-made doctrine will be terminated summarily in the trial court long before the case ever reaches a jury. Municipalities can rest assured, moreover, that, in the highly improbable event that a plaintiff somehow manages to avoid such a fate and obtains a jury verdict finding that the municipality is not entitled to immunity and must pay damages, our current doctrine will see the judgment overturned on appeal "as a matter of law."[11] Despite our declaration that the 1986 codification erected a bar to any future judicial modification; *Durrant* v. *Board of Education*, supra, 284 Conn. 107; the pace of our judicial modifications over the past fifteen years has, at times, been so rapid that we have been unable to keep up with our own innovations.[12] A negligence claim against a municipal employee simply is not a viable theory of recovery in the overwhelming majority of cases brought in Connecticut today.

It would try the reader's patience beyond the breaking point to explicate the many sources of this erroneous turn. The remainder of part I of this opinion, therefore, will focus primarily on what I believe to be the mistake most responsible for the doctrinal expansion, which is

our failure to observe and enforce the fundamental distinction between corporate (municipal entity) immunity and personal (municipal employee) immunity. The distinction is critical because the former always has been substantially broader than the latter, a well-known historical fact that this court unfortunately has forgotten in recent years. The distinction figured prominently in the common law of this state; it was very familiar to the Connecticut legislature by 1957, when widespread concern over the threat of municipal employees' exposure to personal liability for on-the-job negligence resulted in the passage of the highly controversial municipal indemnification statute, General Statutes § 7-465, and, as I discuss later in this opinion, the legislature embedded the distinction in the text and structure of § 52-557n itself. It is regrettable that this court has, since 1986, almost completely removed the preexisting domain of liability, which was substantial, and it is discomforting that we have done so in the name of "construing" legislation that actually compels the opposite result.

B

Until recently, our common law very clearly distinguished between municipal entity immunity and the personal immunity of municipal employees. This historical distinction, though largely overlooked in our recent case law, was readily acknowledged by this court in the not-too-distant past. Thus, " '[i]t was once said that as a general rule governmental officers and employees were personally liable for their torts, more or less without exception, even where the governmental unit itself was protected by an immunity.' [W. Keeton et al., Prosser and Keeton on the Law of Torts (5th Ed. 1984) § 132, p. 1056]; see also G. Bermann, 'Integrating Governmental and Officer Tort Liability,' 77 Colum. L. Rev. 1175, 1178 (1977); 63A Am. Jur. 2d, Public Officers and Employees § 358 (1984)." *Gordon* v. *Bridgeport Housing Authority*, 208 Conn. 161, 165–66, 544 A.2d 1185 (1988); see also *Spears* v. *Garcia*, 263 Conn. 22, 36, 818 A.2d 37 (2003).[13]

I will confine myself here to four observations regarding Connecticut's common law governing the personal immunity of municipal employees prior to the passage of § 52-557n in 1986. First, far from being a fixture of our law since its inception, the municipal employee immunity doctrine was not recognized in Connecticut until 1920. See *Gordon* v. *Bridgeport Housing Authority*, supra, 208 Conn. 166 ("[t]his court first adopted a version of qualified official immunity in 1920 in *Wadsworth* v. *Middletown*, 94 Conn. 435, 439, 109 A. 246 (1920), [in which] we said that since certain public officials were 'engaged upon a governmental duty . . . so long as they act in good faith, in the exercise of an honest judgment, and not in the abuse of their discretion, or maliciously or wantonly, they cannot be held liable' ").

This doctrinal fact is no mere historical curiosity; it has unmistakable and unavoidable *constitutional* implications because a common-law cause of action in existence in 1818 cannot be abrogated. Article first, § 10, of the Connecticut constitution provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay." "[A]ll rights derived by statute and the common law extant at the time of the adoption of article first, § 10, are incorporated in that provision . . . ." *Gentile* v. *Altermatt*, 169 Conn. 267, 286, 363 A.2d 1 (1975), appeal dismissed, 423 U.S. 1041, 96 S. Ct. 763, 46 L. Ed. 2d 631 (1976); see *Sharp* v. *Mitchell*, 209 Conn. 59, 64, 546 A.2d 846 (1988).[14] When we ignore the traditional common-law distinction between municipal entity immunity and the municipal employee's personal immunity, we also overlook this lurking constitutional issue, which, regardless of whether it is meritorious in the final analysis, is by no means insubstantial.

Second, the citation in *Gordon* to the seminal decision in *Wadsworth* v. *Middletown*, supra, 94 Conn. 435, is telling because *Wadsworth* actually demonstrates how far we have strayed from the original doctrine. *Wadsworth*, in fact, *rejected* a personal immunity defense and *affirmed* a substantial damages judgment in favor of the plaintiff against the defendant town official for the destruction of trees located on the plaintiff's roadside property. Id., 437–38, 443. The defendant, who was the first selectman of Middletown acting on official business, had sent a man named "Atkins, whom he had occasionally hired to make repairs on the town highways, with a gang of men and with instructions 'to trim off the sides of the roads to the wall and make a good job of it,' " with no further instruction. Id., 442. By affirming the judgment against the defendant, *Wadsworth* shows that our law previously did *not* automatically equate discretion with immunity but, rather, applied an immunity doctrine for discretionary acts using a deferential version of the abuse of discretion standard: "[S]ince [the defendants] are engaged upon a governmental duty in the care and maintenance of the highways, so long as they act in good faith, in the exercise of an honest judgment, *and not in abuse of their discretion*, or maliciously or wantonly, they cannot be held liable." (Emphasis added.) Id., 439; see also id., 440 ("[The defendant's] brief concedes that the exercise of this discretion does not justify [public officials'] acting wantonly or maliciously, *or with a clear abuse of discretion*. And we think this is our own rule." (Emphasis added.)).[15]

Our current law, which holds that municipal employees enjoy complete and unrestrained freedom to act carelessly in the absence of unequivocal mandatory directives instructing their every move,[16] would have

been unrecognizable to the court in *Wadsworth*. Indeed, in this important respect, the doctrine established in *Wadsworth* was the very opposite of our present day, judge-made rule equating discretion with immunity. As the court in *Wadsworth* explained: "The defendant argues that public officials caring for highways may act, in removing obstructions within the highway, within their discretion. . . . As we have pointed out, the defendant's brief practically concedes that the exercise of discretion by a public official in caring for highways does not justify acting maliciously, or wantonly, *or in clear abuse of the discretion by law vested in him*. The finding shows that the defendant cut down a great number of trees which did not obstruct the public easement of travel over the highway, and were in fact distant from it. . . . [A]nd this was done by the defendant, not through mere error of judgment *but through a failure to exercise not merely reasonable discretion but any discretion*." (Emphasis added.) Id., 441. *Wadsworth* did not hold, as we no doubt would today, that the municipal defendants were immune because the decision to cut trees abutting a public roadway was "discretionary" in nature or because the municipal actors would need to exercise judgment and discretion in deciding which particular trees posed a potential hazard to the travelling public. Nor did *Wadsworth* hold, as our recent cases do, that the municipal defendants were immune because no task-specific rules had been promulgated to make the activity ministerial. To the contrary, the court held that the first selectman was *obligated* to provide that task-specific guidance and that he was liable in negligence for the harm resulting from his *failure* to exercise the discretion required of him.[17] Id., 441–42.

This latter point warrants particular emphasis because it is exactly the claim made in the present case by the plaintiff, Angela Borelli, administratrix of the estate of Brandon Giordano. The plaintiff alleges that two of the defendant police officers—Officer Anthony Renaldi and Officer Michael Jasmin of the Seymour Police Department—engaged in a highly dangerous pursuit, at night and well beyond posted speed limits, of a Ford Mustang convertible full of teenagers for no better reason than that the car was equipped with underglow lights.[18] The plaintiff alleges that, in doing so, the officers disregarded their legal obligation to balance the seriousness of the offense with the threat to public safety caused by the pursuit. The plaintiff's claim is that this conduct does not reflect the exercise of discretion but, instead, demonstrates the *failure* to exercise the very discretion required by the governing law and the Seymour Police Department Pursuit Policy. The plaintiff, in other words, advances a *Wadsworth* claim. Like the plaintiff in *Wadsworth*, she is entitled to have a jury determine the merits of that claim.

Third, another important aspect of the common-law,

municipal employee immunity doctrine, also of direct relevance to the present case, has been overlooked by this court since 1986 in its postcodification decisions. This forgotten doctrinal nuance recognizes that the distinction between discretionary and ministerial acts is far more subtle than that drawn in this court's recent case law. Even the more restrictive of the precodification cases recognized this doctrinal subtlety: "A ministerial duty on the part of an official often follows a quasi-judicial [discretionary] determination by that official as to the existence of a state of facts. Although the determination itself involves the exercise of judgment, and therefore is not a ministerial act, *the duty of giving effect, by taking appropriate action, to the determination is often ministerial.*" (Emphasis added.) *Pluhowsky* v. *New Haven*, 151 Conn. 337, 347–48, 197 A.2d 645 (1964); see *Wright* v. *Brown*, 167 Conn. 464, 472, 356 A.2d 176 (1975) (same); *Betts* v. *Dimon*, 3 Conn. 107, 108–109 (1819) (administering legal oath "to a poor imprisoned debtor" is "an act strictly ministerial," even though official administering oath must first make "[an] [i]nquiry . . . to ascertain the legality of administering the oath"). In other words, although the initial decision to undertake a course of action may be based on discretionary considerations, the implementation of that decision "by appropriate action" may still require the exercise of due care under ordinary negligence principles. This important aspect of the discretionary act analysis, necessarily incorporated as part of our immunity doctrine in § 52-557n, has been ignored by this court since 1986.

Fourth, at the time the common-law doctrine of municipal employee immunity was adopted by the legislature and codified at § 52-557n, the *jury* decided when that immunity applied. See *Tango* v. *New Haven*, 173 Conn. 203, 204–206, 377 A.2d 284 (1977) (reversing judgment in favor of defendant on demurrer in negligence action arising from sledding accident at municipal golf course); *Fraser* v. *Henninger*, 173 Conn. 52, 53–54, 61, 376 A.2d 406 (1977) (rendering judgment in connection with negligence action arising out of injuries sustained in basketball game run by municipal recreational program); cf. *Sestito* v. *Groton*, 178 Conn. 520, 523, 526, 423 A.2d 165 (1979) ("the question of the defendant town's negligence . . . should have been submitted to the jury" when town police officer witnessed ongoing brawl in bar's parking lot but did not intervene until after participant shot and killed plaintiff's decedent). Even in cases involving a discretionary function, a jury ordinarily was required to perform fact-finding to determine whether the individual defendant had acted in the exercise of his or her discretion or had failed to exercise discretion that was required properly to discharge his duties, or to decide whether the negligence at issue occurred as part of the initial discretionary act or its subsequent execution by "appropriate action." Under

the common law codified in 1986, a jury was responsible for sorting out these issues. This court nevertheless has seen fit to declare that this is no longer the law, largely because we have fashioned a one-size-fits-all, per se rule, under which everything from driving a car to driving a nail is discretionary. There is nothing left for the jury to decide.

To summarize, the recent, judge-made developments represent a major departure from the law as codified in 1986. Our current doctrine considers virtually anything and everything that a municipal employee does (or omits doing) as discretionary, which, therefore, renders the employee immune from negligence liability. The rule is so extreme that it covers almost every act of every municipal employee, from planning and formulating important governmental initiatives to opening a door.[19] Perhaps more incredible, the current doctrine now appears to confer immunity not only when the government worker has indeed exercised his or her considered "judgment" bearing on public safety, but also, contra *Wadsworth*, when the employee fails to recognize the need to exercise discretion at all because he or she is asleep at the switch, distracted, lazy, oblivious, or otherwise neglectful. In the absence of a specific, binding directive leaving the actor absolutely no room for judgment about how to carry out a particular task, there is no liability for his or her negligence. None of these alterations can be justified as a matter of policy.[20] More important, none of them was recognized, approved, or adopted by the legislature.

C

Additional compelling evidence of the extent to which municipal employees were often exposed to personal liability for negligence under the common law, as it existed at the time of codification in 1986, is found in a series of indemnification statutes enacted by our legislature in the middle of the last century for the express purpose of obligating municipalities to indemnify policemen, and later all other municipal employees, for damages awards against the employee as a result of the negligent performance of the employee's duties.[21] If municipal employees were already protected by anything approaching the near-absolute immunity mythologized in our recent revisionist histories, these indemnification statutes would have been largely unnecessary; at most, such statutes would have been minor, interstitial, belt and suspenders measures intended to fill in any small gaps in the preexisting immunity doctrine. But it was nothing like that at all. The legislative record makes clear that the indemnification statutes—enacted between 1945 and 1971—were considered necessary precisely because police officers and other municipal workers, without such statutory protection, were exposed to the risk of personal financial ruin as a result of common-law negligence liability

arising from the performance of their routine job functions. The *municipality* typically was immune, but the employee was not.

The first such indemnification statute in Connecticut, enacted in 1945, dealt specifically with liabilities for the negligent operation of a motor vehicle by a police officer. See Public Acts 1945, No. 251, codified at General Statutes (1949 Rev.) § 674.[22] As motor vehicles increasingly became essential to law enforcement activity, the looming risk of personal liability imposed on police officers for damages caused by automobile accidents was of widespread concern. Vincent Dooley, corporation counsel for the city of New Haven, explained the problem to the Judiciary Committee during hearings on the bill: "We have had considerable experience from the matter of [p]olice and [f]iremen in our [c]ity, being sued for damages due to the [negligent] operation of motor vehicles." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1945 Sess., p. 202; see also id., remarks of Edward Mugavoro, Chief of Police of the Darien Police Department ("it will give the [p]olice [o]fficer security, to know when he goes out to perform the duty . . . [that he will] not have his life savings washed away through one little accident"). The 1945 statute was enacted to "protect all our policemen who are operating vehicles in the course of business and in any accident." Id., p. 194, remarks of Senator Alfred Tweedy.[23]

In 1953, the legislature acted to broaden the indemnification to include liabilities incurred by a municipal police officer for money damages resulting from the negligent performance of all of the officer's duties, not only driving. See Public Acts 1953, No. 469.[24] "This bill extends this [indemnification] protection . . . to any activity of the policeman in the course of duty unless the liability comes from [the] wilful or wanton actions of the policeman." 5 H.R. Proc., Pt. 7, 1953 Sess., p. 2544, remarks of Representative Frank E. Raymond; see also 5 S. Proc., Pt. 5, 1953 Sess., p. 1605, remarks of Senator George A. Saden ("[T]his bill broadens the protection given to a policeman who is found liable [for] an act performed in the course of his duties. At the present time he is given protection only in those cases [in which] he is operating a vehicle on the public street. This extends that protection to any act he may perform."). By examining the legislation and its background, we again see the legislature responding to liability concerns that are inconceivable under our municipal immunity doctrine, as recently expanded by this court. The particular event prompting the 1955 legislation illustrates the extent of this court's recent departure from preexisting law. The 1955 statute was enacted as the result of a negligence lawsuit brought against a West Haven police officer who accidentally discharged his firearm and killed a fleeing larceny suspect while engaged in an on-foot pursuit. See Conn. Joint Standing

Committee Hearings, Judiciary, Pt. 3, 1953 Sess., pp. 514–15, remarks of Attorney John Mezzinotti (describing incident); 5 H.R. Proc., supra, pp. 2545–46, remarks of Representative John Q. Tilson, Jr. (same). The jury ultimately returned a verdict for the defendant, but the case provoked sufficient concerns that the legislature enlarged the municipality's indemnity obligation to include all liabilities arising from the performance of the officer's duties and in the course of employment, unless due to the wilful or wanton act of the employee. The municipal employee immunity doctrine that today would spell the certain doom of such a lawsuit at the earliest stages of litigation was not even mentioned as a potential bar to liability during the legislature's consideration of the law sixty years ago.

Instead, the legislative history reflects intensive focus on the same general category of common-law liabilities that were the subject of concern eight years earlier in connection with No. 251 of the 1945 Public Acts. Thus, as one proponent of the bill remarked: "I think the policeman performing the duties that are his to perform under the law finds himself subject to a suit and probably liable for damages as a result of the attempt at the performance of his duties, I think that it should fall upon the city to take care of that policeman and see that he doesn't lose his personal fortune or assets that he may have saved throughout the years through hard work." 5 H.R. Proc., supra, p. 2550, remarks of Representative John M. Scanlon; see also Conn. Joint Standing Committee Hearings, Judiciary, Pt. 3, 1953 Sess., p. 514, remarks of Representative J. Marshall Baldwin ("As the statutes read today, the policeman of a municipality can be sued personally for something that was done while he was performing his duty. As you know, policemen are not the best paid people. They protect our life and family and property. I think they have gone a long time without protection that many of us enjoy today."); Conn. Joint Standing Committee Hearings, Judiciary, Pt. 3, 1953 Sess., p. 516, remarks of Lieutenant Haddon ("I am speaking for the Police Benefits Association and the need for this bill has been brought to our attention. . . . I would like to also point out that every police officer in the state is very much interested in this bill."); Conn. Joint Standing Committee Hearings, Judiciary, Pt. 3, 1953 Sess., p. 517, remarks of Everett W. Shaw, executive secretary of the New Haven Police Union ("[w]e would like to point out that a police officer's lifetime effort can be wiped out [overnight] in the line of duty").

All this was prelude to the enactment of § 7-465 in 1957. See Public Acts 1957, No. 401, § 1 (P.A. 57-401). The passage of § 7-465 marked a watershed event in the law of municipal liability because the statute effectively eliminated the defense of municipal entity immunity in a broad range of cases by extending to *all* municipal employees the same protection that recently had been

provided, on a selective basis, only to policemen, firemen and teachers. See P.A. 57-401, § 1. After years of effort and study, and despite substantial opposition—which included two gubernatorial vetoes, the first of which successfully blocked the legislation[25]—the legislature voted to override Governor Abraham Ribicoff's veto and to require, in very broad terms, all Connecticut municipalities to indemnify all employees: "Any town, city or borough, notwithstanding any inconsistent provision of law, general, special or local, shall pay on behalf of any employee of such municipality . . . all sums which such employee becomes obligated to pay by reason of the liability imposed upon such employee by law for damages to person or property, if the employee, at the time of the occurrence, accident, injury or damages complained of, was acting in the performance of his duties and within the scope of his employment, and if such occurrence, accident, injury or damage was not the result of any wilful or wanton act of such employee in the discharge of such duty." P.A. 57-401, § 1.

Everyone at the time understood the stakes. They were so high because the legislation served to protect municipal employees from potential financial ruin, not by extending immunity to them but, instead, by shifting the employee's exposure to the municipality itself—that is, by rescinding the municipal entity's immunity. Both sides of the controversy explicitly recognized that passage would require the municipality to pay the damage judgments that were sure to follow. Governor Ribicoff's veto message, which proved unsuccessful, made no bones about it: "In vetoing a substantially similar bill during the 1955 regular session of the General Assembly, I said: 'The effects of this act are widespread and complicated. For hundreds of years municipalities in Connecticut have had a governmental immunity from liability, except where eliminated in particular cases such as injuries resulting from defective roads or sidewalks. *This bill removes the defense of governmental immunity from all our cities and towns.*

" '*Taking away this defense from our municipalities will cause them to be exposed to heavy damages.* These damages in turn will be placed upon the shoulders of the taxpayers. Every municipality will have to bear a considerable cost.

" 'With the rising tax rates in most of our cities and towns, I am unwilling to add to their tax burdens. There is no sound reason why we should now remove a legal defense which has existed for so many years.' [This bill] is open to identical criticism, and I accordingly veto it." (Emphasis added.) 7 S. Proc., Pt. 6, 1957 Sess., pp. 3228–29. Those legislators supporting the veto echoed these sentiments. See id., pp. 3234–37, remarks of Senator Arthur H. Healey; 7 H.R. Proc., Pt. 4, 1957 Sess., pp. 2217–19, remarks of Representative Samuel

S. Googel.

It was no minor matter to override the governor's veto,[26] and the legislative body that did so responded to the governor's criticism with a number of counterarguments. They invoked three principles based on fairness, which further demonstrate the fact that municipal employees at the time were personally liable for their negligent conduct. First was a simple desire to protect municipal employees from ruinous liability. The remarks of Representative Edward C. Krawiecki are illustrative: "[L]et me raise my voice [on] behalf of these little people, who collect your garbage and dig up your streets, and fix up the sidewalks and do the other jobs that surround your city, who drive the trucks, who do all the things which expose them to danger and liability for the injuries that might happen to others in the course of the duty they do to the municipality [and they] let us remember that these jobs which they do are not personal; they're performing those jobs in the course of their employment; and I do not want to see any of my little people lose their houses or lose their possessions, if they have any, to pay a judgment for any injury that might have happened due to negligence in the course of their employment. Certainly the time has come when I think that our cities are better able to bear a loss of such proportions [than] one of my little people, who might lose their house or possessions [and] I urge you to think of that when you vote on this bill." 7 H.R. Proc., supra, p. 2226.[27]

Second, the legislators also were concerned about parity among all municipal workers. They expressed the view that all municipal employees should enjoy the same statutory protections that policemen, firemen and teachers had been granted over the past twelve years. See 7 S. Proc., supra, p. 3241, remarks of Senator Albert C. Snyder (After explaining the historical background of the bill, Senator Snyder stated: "I decided [that] . . . if we've given this to the firemen, [if] we've given it to the policemen, what are the other municipal employees who work for the Street Department, the Board of Health, [who] lug the rubbish out, and so forth, are they second-rate citizens? Should one segment of our municipal employees be covered against liability, suits, damages, in the performance of their work?").[28]

Third, and of equal concern to those supporting the legislation, was the manifest unfairness that inevitably resulted when the cost of a municipal employee's negligence was imposed on the victim of that negligence rather than on the municipality. The legislators expressed the opinion that basic principles of fairness required the cost of the municipality's operations (including the cost of accidents) to be spread among the taxpayers, who are the beneficiaries of those operations. The proponent of the legislation in the House of Representatives, Representative Erving Pruyn, explained: "The [legisla-

tive] [c]ouncil after studying what other states have done, very careful consideration, came to the conclusion that the old doctrine of governmental immunity based as it is on that ancient principle that the [k]ing can do no wrong was outmoded, and that with the great increase of activities now being carried on by the municipalities and the availability at reasonable cost of insurance protection, the municipalities should assume the liability for injuries caused by their employees acting in the performance of their duties, and within the scope of their employment." 7 H.R. Proc., supra, p. 2215.[29]

With respect to the financial burden assumed by the municipalities as the result of the statutory indemnification obligation, those who supported the law pointed out that liability insurance could be purchased to cover such losses. See 7 S. Proc., supra, p. 3230, remarks of Senator Benjamin L. Barringer ("[w]e felt that [the municipalities'] liabilities in this respect could be covered by insurance if they wished, though in many cases, apparently, in the larger cities they would prefer to be self-insured"); 7 H.R. Proc., Pt. 4, 1957 Sess., p. 2223, remarks of Representative A. Searle Pinney ("[t]he public can protect itself through insurance or through one of the self-insuring systems that some of the towns in this state have already adopted"); 7 H.R. Proc., Pt. 5, 1957 Sess., p. 2763, remarks of Representative Pruyn ("The bill provides that this liability of municipal employees may be covered by insurance. I am informed that the cost of this insurance is extremely reasonable.").

The legislative history contains overwhelming evidence that these intentions directly motivated the statute's enactment. The legislative intentions are clear because the ultimate success of the 1957 legislation depended heavily on the analysis and positive recommendation of the Legislative Council, which was charged with the task of studying the merits of the proposal after the 1955 bill was vetoed by Governor Ribicoff, and the Legislative Council's report leaves no doubt about which arguments won the day.[30] After reviewing the background of the proposed legislation and describing some of the information considered by the Legislative Council, including input from Connecticut municipalities and a study of national trends prepared by the Institute for Public Service of the University of Connecticut, the council enumerated seven reasons supporting the view that municipalities should assume legal responsibility for the negligent acts of its employees:[31]

"1. The defense of governmental immunity should be eliminated, and cities should assume the same public liability for which a private individual or corporation which is exercising the same powers would be liable.

"2. The fear that extending municipal responsibility in tort will cause the community to suffer serious losses no longer exists because insurance may be carried on

its employees.

"3. If a municipality is held liable for the negligence of its agents, a more responsible type of employee would be hired and thus the rights of the public would to some extent be protected.

"4. It should be a part of public policy of the community that the party wronged should have a right of action against the principal who made the wrong possible. This should be a part of the protection furnished by the municipality to its citizens in return for taxes.

"5. The basis for the rule of governmental immunity is historical and is not a sound or logical reason for [nonliability] of a municipality.

"6. With the greater increase in the functions and powers of the municipality, the duties of the legal department would be considerably reduced rather than increased.

"7. Greater justice would result if losses from injuries were spread over society instead of being borne by individuals." Report of the Legislative Council (December 7, 1956) p. 12.

The Legislative Council recommended adoption of the proposed legislation on the following grounds: "The [c]ouncil believes that the old rule of governmental immunity is outmoded and that, with the great increase of activities being carried on by municipalities and the availability of insurance at reasonable cost, municipalities should assume liability for injury caused by their employees acting in the performance of their duties and within the scope of their employment. It believes further that [the 1955 legislation vetoed by the governor] is appropriate legislation to accomplish the desired objective." Id., p. 13.

The bill recommended by the Legislative Council became law, over Governor Ribicoff's veto. It was a major piece of legislation. After reviewing the statute and its legislative history in the process of adjudicating a 1974 negligence case brought against a municipal employee, Judge John F. Shea, Jr., stated: "In attempting to determine the intent of the legislature, especially in regard to expanding liability and removing common-law governmental immunity, the court has studied the legislative history of § 7-465. In particular, the [R]eport of the [J]udiciary [C]ommittee of the [L]egislative [C]ouncil has been reviewed. Although § 7-465 was not fully enacted until the 1957 session of the legislature; [P.A. 57-401, § 1]; a similar bill was passed in 1955. Public Acts 1955, No. 72. This bill was vetoed by the governor on the ground that it would remove the defense of governmental immunity and expose municipalities to costly damages. . . . The proposal was then referred to the [L]egislative [C]ouncil for further study. It recommended passage of the act to the 1957 session of the General Assembly. *A review of the [R]eport of*

*the* [L]*egislative* [C]*ouncil and a study of the wording of the bill convince this court that it was the intention of the legislature to subject municipal employees, and hence municipalities by way of indemnification, to liability for discretionary as well as ministerial acts so long as they were performed within the scope of the employment.* Municipalities were, however, not obliged to indemnify for wilful or wanton acts."[32] (Citation omitted; emphasis added.) *Lapierre* v. *Bristol*, 31 Conn. Supp. 442, 446, 333 A.2d 710 (1974). No other conclusion is possible on the basis of the historical record.

Yet another municipal indemnification statute was enacted by our legislature in 1971. See General Statutes § 7-101a.[33] The details of the statute do not matter for present purposes; nor does its close relationship to § 7-465. What does matter is the explanation that this court provided—in 1986—to explain the purpose of the statute, because we see this court acknowledging in frank terms the fact that municipal employees personally *were* subject to common-law negligence liability: "Absent such a statute, claimants injured by the misconduct of municipal officers and employees acting in the course of their official duties would be limited to recourse against individual tortfeasors. The legislature might reasonably have concluded that such limited recourse would be unfair both to the injured claimant and to the municipal officer or employee. From the point of view of the claimant, he would be confronted with a defendant who might well lack the resources to provide adequate compensation for the claimant's injuries. From the point of view of the municipal officer or employee, he would be required to shoulder ultimate liability, as well as the costs of defense, for conduct that was solely beneficial to his municipal employer. To remedy these distortions that the law of [governmental] immunity would otherwise impose upon the fair allocation of the risks of accident and other tortious misconduct, the legislature provided for statutory indemnification by municipalities to relieve individual municipal employees and officers of personal liability for injuries they cause, or are alleged to have caused, to third parties on behalf of their municipalities. In effect, the legislature has created a statutory analogue for the [common-law] doctrine of respondeat superior." *Norwich* v. *Silverberg*, 200 Conn. 367, 374–75, 511 A.2d 336 (1986).

D

The foregoing historical overview demonstrates beyond any doubt that the common law of municipal employee immunity and the correlative web of municipal indemnification statutes existing as of 1986 had established a legal landscape in which the municipal *employees* themselves were understood to be personally liable for the damages negligently caused by their job-related activities, and the municipal *employers* were

liable by statute for the indemnification of those liabilities. The employee's liability for *discretionary* acts was left unclear after § 7-465 was enacted in 1957,[34] but, regardless of whether the discretionary function doctrine had survived, everyone at the time understood that, in any event, the scope of the employee's personal liability (and hence the scope of the municipality's indemnification obligation) encompassed a broad range of day-to-day operational activities, from driving police cars and fire trucks[35] to "collect[ing] your garbage and dig[ging] up your streets, and fix[ing] up the sidewalks and do[ing] the other jobs that surround your city . . . [and that] expose [municipal employees] to danger and liability for the injuries that might happen to others in the course of the duty they do to the municipality." 7 H.R. Proc., Pt. 4, 1957 Sess., p. 2226, remarks of Representative Krawiecki; see part I C of this opinion (discussing extensive legislative history reflecting similar views about broad scope of municipal indemnification statutes).

There are only two possible ways to explain the great change that has transformed the legal landscape described above into today's law of near-absolute immunity for municipalities and municipal employees. One possibility is that the operative doctrinal changes are all incorporated within the text and legislative policy of § 52-557n, the statute enacted for the purpose of codifying the law governing the liabilities and immunities of municipal entities and their employees. The other possibility is that, in the past three decades, we have gradually, and perhaps without even noticing, constructed a doctrine that has lost its foothold in the text and legislative purpose of § 52-557n, resulting in an expanded immunity doctrine that has gained momentum and mass over time, like a snowball rolling downhill. An examination of the language, structure and legislative history of § 52-557n, when considered alongside the doctrinal history previously set forth, confirms my belief that the latter explanation is correct.

Probably the most salient textual feature of § 52-557n is the unmistakable fact, hidden in plain view as it were, that the statute treats the liabilities and immunities of *municipalities* as separate and distinct from the liabilities and immunities of municipal *employees*. This should come as no surprise in light of the fact that the common law has always treated the entity and the employee very differently for such purposes; see part I C of this opinion; and I cannot explain why our cases have overlooked the statutory text in this regard. The statute makes it crystal clear that certain of its provisions apply to *both* the municipality *and* municipal employees, officers and agents, whereas other provisions apply *only* to the municipality itself. More specifically, § 52-557n (a) governs the liabilities and immunities of the *municipality* only. Its plain language says so, more than once, in unmistakable terms. It

begins with these words: "Except as otherwise provided by law, *a political subdivision of the state* shall be liable for damages to person or property caused by . . . [t]he negligent acts or omissions of such political subdivision or any employee, officer or agent thereof acting within the scope of his employment or official duties . . . ." (Emphasis added.) General Statutes § 52-557n (a) (1) (A). Likewise, § 52-557n (a) (2) (B), which contains the discretionary-duty exception, provides: "Except as otherwise provided by law, *a political subdivision of the state* shall not be liable for damages to person or property caused by . . . negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law." (Emphasis added.) *Nothing* in subsection (a) purports to define, delineate, or delimit the liability of municipal *employees*. Subsection (a) of the statute contains no provision immunizing municipal *employees* from liability for their negligent actions or omissions, discretionary or otherwise. This is no technicality.

Nor is it an oversight. We know that the word choice is deliberate because the corresponding language in subsection (b) of the statute stands in stark contrast to the language employed by the legislature in subsection (a). Unlike subsection (a), subsection (b) includes both the municipality *and its employees* within its scope: "Notwithstanding the provisions of subsection (a) of this section, *a political subdivision of the state or any employee, officer or agent acting within the scope of his employment or official duties* shall not be liable for damages to person or property . . . ." (Emphasis added.) General Statutes § 52-557n (b). The difference between the two subsections could not be more obvious.

The rules of construction take over from here and lead to one inevitable conclusion: the plain and unambiguous language of § 52-557n (a) manifestly does not impose liabilities or grant immunities to municipal *employees* and, therefore, cannot serve as the basis for the court's decision with respect to the individual defendants in the present case. The rules of construction require us to give meaning to the fact that § 52-557n (a) addresses liability and immunity with respect to municipalities only, whereas § 52-557n (b) applies to both municipalities and their employees. It is "a fundamental tenet of statutory construction that [t]he use of the different terms . . . within the same statute suggests that the legislature acted with complete awareness of their different meanings . . . and that it intended the terms to have different meanings . . . ." (Internal quotation marks omitted.) *Hasselt* v. *Lufthansa German Airlines*, 262 Conn. 416, 426, 815 A.2d 94 (2003); accord *Marchesi* v. *Board of Selectmen*, 328 Conn. 615, 640–41, 181 A.3d 531 (2018); *C. R. Klewin Northeast, LLC* v. *State*, 299 Conn. 167, 177, 9 A.3d 326

(2010); *Felician Sisters of St. Francis of Connecticut, Inc.* v. *Historic District Commission*, 284 Conn. 838, 850, 937 A.2d 39 (2008). Section 52-557n is not exempt from this basic rule of construction. Indeed, this court has found that far more subtle differences in word choices contained in this very statute reflect meaningful legislative choices that must be honored. See *Ugrin* v. *Cheshire*, 307 Conn. 364, 385, 54 A.3d 532 (2012) (holding, with respect to language of § 52-557n (b) (4), that "[the] difference in the use and meaning of 'if' and 'unless' within the same statute cannot be ignored"). If we take the rules of construction seriously, we cannot overlook this dispositive point.

The foregoing statutory analysis does not establish definitively that immunity is unavailable to the individual defendants as a matter of law in the present case. It does, however, establish without any doubt that the majority cannot be correct that the individual defendants are entitled to immunity *by virtue of § 52-557n* because the relevant language of that statute plainly and unambiguously applies only to municipalities, not to municipal employees. There is no other way to read the statutory text.[36]

The only issue left unaddressed and unclear in the relevant statutory text is whether the legislature intended to leave the employee unprotected by way of municipal indemnification, which seems very unlikely, or, instead, intended to retain indirect municipal liability for the employee's negligence under § 7-465 or other applicable indemnification statutes. Presumably, the statute's "except as otherwise provided by law" proviso answers this question by retaining the statutory indemnification.[37] This conclusion is consistent with statements in the legislative history indicating an intention to impose liability on both the employee and the municipality. Representative Robert G. Jaekle, the proponent in the House of Representatives of the bill that became § 52-557n, expressed no uncertainty on the matter: "Many other questions were posed, statements, the teacher negligently injures a student and [the municipalities] are not going to [be] liable. *Well, of course, they are going to be liable.* And this [bill] says so. But is the town going to be liable if two students get in a fight with each other and student one hurts student two? Is the town liable under a theory that the teacher negligently supervised the activities of the children? That is [third-party] liability. *If the teacher negligently injures a student, the town is going to be liable under this language.* That is the thrust all the way through." (Emphasis added.) 29 H.R. Proc., Pt. 16, 1986 Sess., p. 5942.

One additional point implicit in these observations warrants emphasis. The only reference to the discretionary function doctrine anywhere in the statute appears in subsection (a), which, as I have noted,

speaks only to the liabilities and immunities of the municipal entity. The statute provides that the *entity* shall not be liable for damages caused by the employee's negligent acts or omissions acting in his or her discretionary capacity. See General Statutes § 52-557n (a) (2) (B). It leaves the liability of the employee to be determined under the common law, which the statute codified without alteration. See footnote 3 of this opinion. This means that, under the statute, the employee retains the same liabilities as existed under preexisting law, subject only to the provisions of subsection (b) of the statute. Subsection (a) does not expand or modify the discretionary duty doctrine or any other aspect of employee liability, and, therefore, any changes made to that doctrine by this court since 1986, by definition, contravene the legislature's intention to codify preexisting law.

There are other lessons to be learned from reading the statute as written. Far from making immunity the near-absolute rule, as we have done since 1986 by judicial construction, § 52-557n, as written by the legislature, strongly suggests that immunity is intended to be an *exception* to a general rule of municipal liability. Subdivision (1) of § 52-557n (a) provides that "a political subdivision of the state *shall be liable* for damages to person or property caused by" conduct that falls within three basic categories of liability, two of which are very broad: negligence, in § 52-557n (a) (1) (A), and nuisance, in § 52-557n (a) (1) (C). Subdivision (2) of § 52-557n (a) then establishes two limited exceptions to the general rule of liability by providing that municipalities shall not be liable for damages to person or property caused by (1) acts or omissions "which constitute criminal conduct, fraud, actual malice or wilful misconduct"; General Statutes § 52-557n (a) (2) (A); or (2) "negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law." General Statutes § 52-557n (a) (2) (B).

Our decisions unfortunately have turned the statute upside down by construction—liability is now the rare exception to a general rule of immunity. In its current, judicially revised version, the statute now reads: "Neither a political subdivision of the state *nor any employee, officer or agent thereof shall be liable* for damages to person or property caused by the negligent acts or omissions of such political subdivision or any employee, officer or agent thereof acting within the scope of his employment or official duties *unless such damages are caused by acts or omissions that violate the clear and express provisions of a city charter, ordinance, regulation, rule, policy or other directive requiring the employee, officer or agent to act in a prescribed manner*." The actual statute says no such thing, of course, and its language and structure both imply a very different meaning. Our rules of construc-

tion prohibit judicial policymaking of this kind. See, e.g., *Commissioner of Emergency Services & Public Protection* v. *Freedom of Information Commission*, 330 Conn. 372, 393, 194 A.3d 759 (2018) ("It is axiomatic that the court itself cannot rewrite a statute to accomplish a particular result. That is the function of the legislature." (Internal quotation marks omitted.)).[38]

One additional structural feature of § 52-557n is of particular relevance in the present case. Subsection (b) contains a series of express exceptions or limitations to the liability rule set forth in subsection (a). It enumerates ten specific circumstances in which neither the municipality *nor* the employee is liable, or is liable only under certain limited conditions, notwithstanding anything in subsection (a) to the contrary. See General Statutes § 52-557n (b) (1) through (10). These special cases cover a wide variety of circumstances in which the immunity had not previously been clearly established. The legislature evidently wished to make its intentions known with respect to these particular scenarios so that there would be no doubt in the future. The enumerated circumstances include, for example, the condition of unimproved municipal property; General Statutes § 52-557n (b) (1); the initiation of any judicial or administrative proceeding, unless "commenced or prosecuted without probable cause or with a malicious intent to vex or trouble"; General Statutes § 52-557n (b) (5); and the "failure to make an inspection or making an inadequate or negligent inspection of any property, other than property owned or leased by or leased to such political subdivision, to determine whether the property complies with or violates any law or contains a hazard to health or safety, unless the political subdivision had notice of such a violation of law or such a hazard or unless such failure to inspect or such inadequate or negligent inspection constitutes a reckless disregard for health or safety under all the relevant circumstances . . . ." General Statutes § 52-557n (b) (8).

Two interrelated features of this statutory enumeration leap out. First, *none* of the ten exceptions relates to the negligent operation of motor vehicles under routine or emergency conditions. Motor vehicles are not mentioned at all, and there is not even a whisper of any intention to repeal or alter the long existing legal regime imposing liability for the negligent operation of a municipal vehicle, whether routine or emergency.[39] The majority has an obligation, in my view, not merely to explain why we should assume that the legislature intended to create immunity, sub silentio, for the negligent operation of motor vehicles, but why we should assume that it did so silently in a statute that contains a lengthy list of *express* liability exemptions for immunities not already plainly established under the law existing at the time § 52-557n was enacted.

Second, and relatedly, there is no indication that the legislature intended this particularized enumeration to be nonexhaustive or merely illustrative; to the contrary, the legislature manifestly paid very close attention to detail in fashioning subsection (b). The statutory enumeration is carefully drawn and covers many different scenarios, some rather obvious and others obscure in nature. The legislature drew fine lines and made nuanced distinctions in its treatment of the circumstances selected for inclusion. We cannot avoid application of the canon of expressio unius est exclusio alterius. See, e.g., *DeNunzio* v. *DeNunzio*, 320 Conn. 178, 194, 128 A.3d 901 (2016) ("[u]nder the doctrine of expressio unius est exclusio alterius—the expression of one thing is the exclusion of another—we presume that when the legislature expresses items as part of a group or series, an item that was not included was deliberately excluded").[40]

Finally, I address the majority's suggestion that the doctrine of legislative acquiescence operates to ratify our misconstruction of § 52-557n due to the passage of time. "[S]urely," the majority states, "at some point in the . . . years that have passed since the passage of § 52-557n, the legislature would have weighed in [to correct such an error]." Footnote 12 of the majority opinion. This is an odd theory of lawmaking. It appears to distort the constitutionally prescribed order of things by relying on a *later* legislative body, the members of which may have had no role at all in the original legislation, to review judicial opinions, not for the purpose of ensuring fidelity to the original legislative intention, but to decide if the court's gloss comports with the later legislature's idea of good public policy at that time. I do not maintain that the doctrine of legislative acquiescence is rotten to its core; it may, under limited circumstances, provide a modicum of assistance when construing a statute. See *State* v. *Salamon*, 287 Conn. 509, 522, 949 A.2d 1092 (2008) (noting that "legislative inaction is not always the best of guides to legislative intent" but providing examples of when court nonetheless has done so (internal quotation marks omitted)). But legislative acquiescence should not be invoked to justify or ratify an erroneous construction of a statute, even if a new legislature later may consider that construction to be acceptable or even salutary. I thus agree with Justice Frankfurter that "we walk on quicksand when we try to find in the absence of corrective legislation a controlling legal principle." *Helvering* v. *Hallock*, 309 U.S. 106, 121, 60 S. Ct. 444, 84 L. Ed. 604 (1940). There are numerous reasons to tread cautiously. Here is a good summary: "The verdict of quiescent years cannot be invoked to baptize a statutory gloss that is otherwise impermissible. [The United States Supreme Court] has many times reconsidered statutory constructions that have been passively abided by Congress. Congressional inaction frequently betokens unawareness,

preoccupation, or paralysis. It is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law. . . . Where, as in the case before [the court], there is no indication that a subsequent Congress has addressed itself to the particular problem, we are unpersuaded that silence is tantamount to acquiescence . . . ." (Citations omitted; internal quotation marks omitted.) *Zuber* v. *Allen*, 396 U.S. 168, 185–86 n.21, 90 S. Ct. 314, 24 L. Ed. 2d 345 (1969). In any event, and regardless of one's views on the subject generally, everyone appears in agreement that the doctrine of legislative acquiescence should carry no force when, as here, the legislature has not revisited the statutory provisions at issue since the relevant cases were decided.[41]

I conclude this section by explaining that my purpose is not to cry over spilled milk. I am aware that the damage in large part has been done, and I am realistic enough to understand that this court is not soon going to reverse course with respect to most of the doctrinal changes that I critique in part I of this opinion. I also understand that it is unlikely that the legislature will restore the statute to its original meaning now that this court has done the work that the legislature was unable or unwilling to do—as a result of the various demands, imperatives, deal-breakers, trade-offs and other political forces at play between and among the political stakeholders and interest groups at the negotiating table— in 1986, when the provisions of § 52-557n were hammered out as part of a much larger legislative initiative known as the Tort Reform Act of 1986. See, e.g., *Sanzone* v. *Board of Police Commissioners*, 219 Conn. 179, 185, 592 A.2d 912 (1991) ("[a]s finally enacted, the [Tort Reform Act of 1986] represents a complex web of interdependent concessions and bargains struck by hostile interest groups and individuals of opposing philosophical positions"). Nor is my intention to scold the court for its errant construction of a statute. Section 52-557n is poorly built. It contains vague terms that reflect opaque and perhaps even contradictory intentions, and, by its terms, it incorporates wholesale a patchwork of common-law doctrines that lack any overarching internal consistency themselves because each is the product of highly particularized contextual considerations that have no currency in society today. The task of interpretation becomes still more challenging because the statute repeatedly states that its provisions apply only "[e]xcept as otherwise provided by law"; General Statutes § 52-557n (a); a phrase that we have construed to include statutory and common law alike. We are left to find our way in a swirling vortex of rules swallowed by exceptions swallowed by rules and more exceptions, and it is no wonder that we have lost our bearings.

My purpose, rather, is to issue a plea that we open ourselves to the possibility that we have taken things

too far. We have issued what I consider to be a regrettable series of judicial decisions that has decimated a previously active and important realm of negligence law, and I hope that we will be more careful in the future. Real people have sustained, and will continue to sustain, real harm, sometimes catastrophic in nature, because of the negligence of municipal employees whose careless job performance has created or increased the risk of harm to innocent victims in public places. Since 1986, our cases have expanded the immunity for these employees on the theory that their exercise of discretion should not be second-guessed because such oversight may "cramp" their exercise of discretion. See, e.g., *Doe* v. *Petersen*, 279 Conn. 607, 609–10, 614, 903 A.2d 191 (2006) (concerns about "cramp[ing] the exercise of official discretion" justify extending immunity to town employee's negligent mishandling of teenage girl's report that she was sexually molested by her instructor at municipal tennis program). I find this reasoning nothing short of nonsensical, at least as applied to day-to-day operational activities such as driving a car, shoveling snow from a walkway, and opening a hallway door. The fundamental public policy underlying our negligence law is that we *want* to inhibit carelessness. That is what tort liability rules do. Negligence law gives social actors (and usually their employers) a financial incentive to consider the safety of others before engaging in conduct that entails the foreseeable risk of harm. This has always been our state's general policy applicable to municipal employees, and it was extended to municipal employers in our indemnification statutes. "We cannot afford the cost of operating with due care" is not an acceptable reason, in my opinion, to fashion a doctrine exempting a large class of social actors from the legal requirements applicable to the rest of society.

## II

### A

I leave behind the generalized doctrinal critique set forth in part I of this opinion and now address the present case. Nothing that follows, in either part II or part III of this opinion, depends for its validity on the reader's acceptance of the foregoing critique. I start part II with the same point of emphasis, however, by highlighting the particular context in which this case arose. Officers Renaldi and Jasmin were driving motor vehicles on a public roadway. That context is critical because the law imposes a *duty*—a legally enforceable obligation to drive with due regard for the safety of others—on *all* persons operating a motor vehicle on public roads.[42] This is not a mere "duty in the air"[43] or a duty that disappears when a police officer activates his lights and siren. The plain language of § 14-283 (d) says exactly the opposite: "The provisions of this section *shall not relieve the operator of an emergency*

*vehicle from the duty to drive with due regard for the safety of all persons and property.*" (Emphasis added.) Indeed, this court reached the very same conclusion in a unanimous decision authored by former Chief Justice Peters.[44] See *Tetro* v. *Stratford*, supra, 189 Conn. 609–11 (affirming judgment against town police officers for negligent operation of vehicle during vehicular pursuit). If the plain statutory text and unmistakable import of *Tetro* were not enough to prove the point, there is additional evidence—I would say there is overwhelming legal authority—to the same effect dating back nearly one hundred years. The majority's holding today inexplicably changes all of this by conferring blanket immunity on police officers who fail to exercise reasonable care while engaging in pursuits on public roads. In doing so, the majority not only engages in what I consider to be very poor policymaking, but it does so in the face of the legislature's obvious and express intention to hold operators of emergency vehicles legally responsible for the negligent operation of their vehicles at all times.

At the outset, I disagree with the efforts by the majority opinion and Chief Justice Robinson's concurring opinion to characterize this appeal as not being about driving. In my view, the plaintiff's negligence claim, and this appeal from the striking of that claim, relate directly to the acts and omissions of the defendant officers in driving their vehicles without due regard for the safety of the plaintiff's decedent. I understand that this may become an easier case to decide if the appeal "does not concern . . . whether and under what circumstances the duty to drive with due regard for the safety of others is discretionary or ministerial." Footnote 5 of the majority opinion. But that is not the situation here. The plaintiff's fundamental claim is that the plain and mandatory language of § 14-283 (d) expressly imposes a duty on operators of emergency vehicles "*to drive* with due regard for the safety of all persons and property.*" (Emphasis added.) General Statutes § 14-283 (d). Every substantive pleading and motion filed in this case, by either side, demonstrates that the plaintiff's claims, and the defendants' defenses, necessarily require consideration of the immunity question, as applied to the vehicular pursuit from its initiation to its tragic end.[45] Although, no doubt, a *part* of the plaintiff's appellate brief (part B 1) focuses attention on the police officers' decision to initiate the pursuit, and perhaps overemphasizes the importance of that threshold issue in the overall analysis, another part (part B 2) argues that the duty of care applies during an emergency pursuit *to the act of driving itself.*[46] As one would expect in a case in which the plaintiff's legal and factual claims always have included the entire duration of the police pursuit, the appellate argument extends beyond the decision to initiate the chase. Thus, portions of the introductory part of the plaintiff's brief, portions of the statement

of facts, and the entirety of part B 2 of the argument all serve the plaintiff's claim that the act of *driving*— the dangerous operation of an emergency vehicle at high speeds rather than the decision only to initiate the pursuit—is the activity that makes this case different from the typical immunity situation and that requires a different outcome.[47] The portions of the plaintiff's brief quoted by the majority and the Chief Justice's concurrence, which focus exclusively on the officer's decision to initiate the pursuit, do not nullify or blot out the *other* portions of the plaintiff's brief (including those quoted in footnote 47 of this opinion), which the plaintiff offers in support her alternative argument, contained in part B 2 of her brief, contending more broadly that immunity does not attach to the officer's negligent operation of his vehicle *during* the pursuit.[48] Although, at one level, I take comfort that the majority chooses to leave for another day the core question raised on appeal—namely, whether immunity attaches to the negligent operation of a police car *during* a chase—I do not believe that this choice is fair to the plaintiff, and, therefore, I will address the issue left undecided by the majority.

We can begin on common ground. I take it that we can all agree that police officers and their municipal employers are subject to liability under existing law for personal injuries caused by the officer's negligent operation of a motor vehicle in routine (i.e., nonemergency) conditions. See, e.g., *Winn* v. *Posades*, 281 Conn. 50, 59–60, 913 A.2d 407 (2007) (holding that plaintiff must prove proximate causation in negligence case against municipal police officer based on excessive speed in nonemergency situation); *Dumas* v. *Mena*, 82 Conn. App. 61, 62, 842 A.2d 618 (2004) (affirming judgment imposing liability for personal injuries caused by negligent operation of motor vehicle by on-duty police officer); *Hunter* v. *Healey Car & Truck Leasing, Inc.*, 41 Conn. App. 347, 349–51, 675 A.2d 919 (plain error for trial court to direct verdict for police officer in negligence action brought on behalf of child struck by vehicle driven by officer while on-duty), appeal dismissed, Connecticut Supreme Court, Docket No. SC 15483 (December 18, 1996). The point is confirmed by the very existence of our various indemnification statutes enacted to protect municipal employees, including police officers, from the financial consequences of common-law tort liability for damages caused by their on-duty, negligent operation of motor vehicles; concerns about liability arising from negligent driving in large measure account for the enactment of our municipal indemnification statutes. See part I C of this opinion.

It is well established that police officers are situated no differently from any other municipal employee in this respect. See, e.g., *Rokus* v. *Bridgeport*, 191 Conn. 62, 63–64, 72, 463 A.2d 252 (1983) (affirming judgment against city and municipal employee for personal injur-

ies caused by negligent operation of municipally-owned dump truck); *Muckle* v. *Pressley*, 185 Conn. App. 488, 489, 197 A.3d 437 (2018) (appeal from judgment against city and employee for property damage resulting from negligent operation of motor vehicle by municipal employee in course of employment); *Madsen* v. *Gates*, 85 Conn. App. 383, 385–86, 857 A.2d 412 (affirming judgment in favor of one plaintiff and against second plaintiff struck by town vehicle), cert. denied, 272 Conn. 902, 863 A.2d 695 (2004); cf. *Fiano* v. *Old Saybrook Fire Co. No. 1, Inc.*, 332 Conn. 93, 95–97, 209 A.3d 629 (2019) (holding that municipality was not liable for negligent operation of motor vehicle driven by volunteer firefighter while not engaged in course of employment).

Historically speaking, ordinary negligence principles so plainly apply to municipal employees who drive motor vehicles on public roadways that the rubric of municipal immunity typically is not invoked at all in this context. The clear thrust of cases such as *Winn*, *Dumas*, *Hunter*, *Rokus*, *Muckle*, and *Madsen* demonstrates that the usual, day-to-day operation of motor vehicles by municipal employees on public roadways is not subject to the municipal employee immunity doctrine, period. This is true because, unlike situations in which no particularized legal duty is owed by the municipal employee to "protect" the public,[49] the municipal employee operating a motor vehicle *does* owe a duty of care to other drivers and their passengers, pedestrians, and others lawfully using the roadway. *Every* driver—public or private, on-duty or off—owes a duty of care to every other person using the roadway, whether they be a driver, passenger, or pedestrian. See, e.g., *Mahoney* v. *Beatman*, 110 Conn. 184, 188, 147 A. 762 (1929) ("[t]he defendant owed to the plaintiff and all travelers upon the highway the duty of exercising reasonable care in operating his car so that there might result from such operation no probability of harm to them"); *Heimer* v. *Salisbury*, 108 Conn. 180, 183, 142 A. 749 (1928) ("The appellant's criticism of this charge seems to be that the standard of duty for the police officer is said to be the same as for any other user of the highway. In this the court was right. The general standard of care which the law requires is the same for all using the highway—that which a reasonably prudent person would exercise under the same circumstances."); *State* v. *Carter*, 64 Conn. App. 631, 642, 781 A.2d 376 ("[a]n operator of a motor vehicle is always under a duty to exercise reasonable care"), cert. denied, 258 Conn. 914, 782 A.2d 1247 (2001); see also General Statutes § 14-300d ("each operator of a vehicle shall exercise due care to avoid colliding with any pedestrian or person propelling a human powered vehicle and shall give a reasonable warning by sounding a horn or other lawful noise emitting device to avoid a collision"); *Palombizio* v. *Murphy*, 146 Conn. 352, 357, 150 A.2d 825 (1959) ("[a driver] is required to keep a reasonable

lookout for any persons and traffic he is likely to encounter, and he is chargeable with notice of dangers of whose existence he could become aware by a reasonable exercise of his faculties"); Connecticut Civil Jury Instructions 3.7-17, available at http://www.jud.ct.gov/JI/Civil/civil.pdf (last visited June 22, 2020) ("[t]he driver of an automobile has a duty to use reasonable care to avoid injury to other persons using the road").

Our legal culture, as it functions each and every day in law offices, legal departments, and courthouses across Connecticut, is attuned to the express legislative purpose underlying the various indemnification statutes discussed in part I of this opinion, which were enacted for the very purpose of indemnifying police officers, firemen, and other municipal employees for personal liability arising from motor vehicle accidents caused by their negligent driving at work. Courts and litigants involved in these cases apparently consider it self-evident that municipal employees could be found liable for the negligent operation of a motor vehicle.[50]

What has been said so far likely explains why it has taken until now, approximately one century after municipal employees first began using automobiles to perform their jobs, for this court even to be asked to decide whether driving is "ministerial" or "discretionary" for purposes of our municipal employee immunity doctrine.[51] It has not taken so long for the question to arise because municipal employees are exceptionally careful drivers. The real reason is that, historically, everyone has always taken it for granted that all drivers owe a duty of care to all other users of the roadway, and, at least in the absence of an express legislative exemption from this rule,[52] municipal immunity does not apply. The discretionary versus ministerial issue never has been part of the analysis. Indeed, we know with certainty that, when the personal liability of municipal employees for negligent driving became an issue of public concern in the middle of the last century, the legislature did not even consider conferring immunity on those employees; it did virtually the opposite by effectively removing the municipality's immunity via the indemnification statutes.

Nor does the discretionary/ministerial distinction make any real sense in the context of driving. To force the analysis reflects a concession to the artificial demands of doctrinal pigeonholes rather than a useful exercise in legal reasoning—no one honestly would assert that driving a car requires less in the way of judgment and discretion than, for example, the "discretionary" acts of shoveling snow or wiping down wet bleachers.[53] To the contrary, anyone who drives a car knows that safe driving requires far more than rote ministerial compliance with pre-scripted directives. Safe driving depends largely on the operator's human ability to react appropriately to the amazingly complicated, multi-variant, and

ever-present risk of unpredictable, unforeseen and some-times unforeseeable roadway occurrences requiring a near-instantaneous exercise of coordinated perceptive, cognitive and muscular activity.[54] This is true of all driving in all vehicles, whether personal cars, municipal vehicles, dump trucks, pickup trucks or garbage trucks. Safe driving, in short, requires good judgment, which is how we sometimes refer to the prudent deployment of discretionary decision making.

In point of fact, the "rules of the road" recognize and operate on the inherently discretionary nature of the activity we call driving. This is to say that many of our driving rules, whether statutory or common-law, do not eliminate the role of discretion by providing directives susceptible to mechanical and ministerial application. They do exactly the opposite. The rules *demand* the exercise of discretion and good judgment.[55] They do so in recognition of the fact that the safe operation of a motor vehicle often involves the very type of split-sec-ond decision making that, in *other* contexts, serves as the signature feature of what our immunity doctrine labels a "discretionary" act.[56] Despite this rather obvi-ous point, our cases have never conferred immunity to municipally-employed drivers in the ordinary course; nor has the legislature ever given any indication that it intends such a result by statute.

A rule of immunity would be exceedingly difficult to justify in this context because it would mean that our municipal employees would be free to drive negligently with impunity. See *Daley* v. *Kashmanian,* 193 Conn. App. 171, 188, 219 A.3d 499 (2019) (observing that, if "under all circumstances a municipal police officer operating a motor vehicle is engaged in discretionary conduct," then this would "immuniz[e] the officer and municipality from damages arising from all violations of motor vehicle statutes"), petition for cert. filed (Conn. October 23, 2019) (No. SC 190245), and cross petition for cert. filed (Conn. November 1, 2019) (No. SC 190256); *Williams* v. *New London,* Superior Court, judi-cial district of New London, Docket No. CV-12-6012328-S (April 7, 2014) (58 Conn. L. Rptr. 86, 88) (if routine driving was not ministerial, municipal drivers could "claim that they have discretion to run stop signs, ignore pedestrians in the crosswalk, or exceed the speed limit while driving through city streets"). Among other regrettable consequences, an immunity regime in this context would (1) leave the victim uncompensated for damages sustained due to the defendant's negligence when operating a vehicle on public roads,[57] and (2) remove the deterrent effect that the tort system exer-cises on all other drivers and their employers (through the doctrine of respondeat superior and indemnification statutes), who otherwise would face a far lessened financial incentive to encourage safe driving and dis-courage carelessness. See generally *Doe* v. *Cochran,* 332 Conn. 325, 363, 210 A.3d 469 (2019) ("[t]he fundamental

policy purposes of the tort compensation system [are] compensation of innocent parties, shifting the loss to responsible parties or distributing it among appropriate entities, and deterrence of wrongful conduct" (internal quotation marks omitted)); *Robbins* v. *Physicians for Women's Health, LLC*, 311 Conn. 707, 722–23, 90 A.3d 925 (2014) ("[b]y assigning responsibility to employers for the legal consequences of their employees' errors of judgment and other lapses, the doctrine of respondeat superior 'creates an incentive for principals to choose employees and structure work within the organization so as to reduce the incidence of tortious conduct'"), quoting 1 Restatement (Third), Agency § 2.04, comment (b), p. 141 (2006); see also W. Keeton et al., supra, § 69, pp. 500–501 (employer liable for torts of employee because employer has control over selection, instruction, and supervision of employees, will profit from enterprise, and is better able to bear costs of doing business).

These implications have not been lost on the courts of our sister states. Even those states applying the ministerial/discretionary analysis consistently hold routine driving by municipal employees to be a ministerial function. See, e.g., *Evans* v. *Cotton*, 770 So. 2d 620, 623 (Ala. Civ. App. 2000) (correctional officer was engaged in ministerial function when driving van); *Snyder* v. *Curran Township*, 167 Ill. 2d 466, 472–73 and n.4, 657 N.E.2d 988 (1995) (overruling prior decision holding that driving snowplow is discretionary); *Jones* v. *Lathram*, 150 S.W.3d 50, 53 (Ky. 2004) ("the act of safely driving a police cruiser, even in an emergency, is not an act that typically requires any deliberation or the exercise of judgment"); *Prince George's County* v. *Brent*, 414 Md. 334, 356, 995 A.2d 672 (2010) ("ordinarily the operation of a vehicle by [anyone], including a public official, is a mere ministerial act" (internal quotation marks omitted)); *Davis* v. *Little*, 362 So. 2d 642, 643–45 (Miss. 1978) (member of county board of supervisors was engaged in ministerial act when driving pickup truck); *Brown* v. *Tate*, 888 S.W.2d 413, 415 (Mo. App. 1994) ("a police officer, driving on the public streets and highways, in a [nonemergency] situation, has no blanket immunity from liability for negligence in the operation of his car"); *Salek* v. *Burton*, Docket No. 2865, 1979 WL 207732, *1 (Ohio App. July 18, 1979) ("[t]he driving of vehicles is . . . a ministerial act and not immune"); *Kyllo* v. *Panzer*, 535 N.W.2d 896, 903 (S.D. 1995) ("[i]t is inconceivable that driving a motor vehicle is anything other than a ministerial function"); *Victory* v. *Faradineh*, 993 S.W.2d 778, 781 (Tex. App. 1999) ("an officer driving a motor vehicle while on official, [nonemergency] business is performing a ministerial act"); *Morway* v. *Trombly*, 173 Vt. 266, 273, 789 A.2d 965 (2001) (operation of snowplow was ministerial); *Heider* v. *Clemons*, 241 Va. 143, 145, 400 S.E.2d 190 (1991) ("[w]hile every person driving a car must make

myriad decisions, in ordinary driving situations the duty of due care is a ministerial obligation"); *Legue* v. *Racine*, 357 Wis. 2d 250, 298, 849 N.W.2d 837 (2014) (driving is "a paradigmatic ministerial act").

Municipal police officers, like all other drivers, were and remain legally liable at common law for damages caused by their negligent operation of a motor vehicle during nonemergency conditions. This legal liability flows from the legal duty owed by all drivers, public and private alike, to the occupants of all other vehicles, pedestrians, and others lawfully using the roadway. Pursuant to our indemnification statute, § 7-465, a municipal employee's personal financial exposure in this context is removed by the employer's indemnification obligation.

B

The only remaining issue—the one presented by this case—is whether the foregoing analysis changes when the municipal employee operates a motor vehicle in "response"[58] to an emergency under the aegis of § 14-283 rather than in the ordinary course under the ordinary rules of the road. The majority sidesteps the issue by addressing only the initiation of the pursuit, but its analysis contains dicta indicating its view that everything changes when the vehicle is being operated in an emergency capacity within the purview of § 14-283. I respectfully disagree. In my opinion, the fact that a municipal police officer activates his emergency lights and engages in vehicular pursuit does not confer immunity on the officer for his negligent operation of a motor vehicle resulting in personal injury or property damage. For the reasons that follow, I do not even view it as a close legal question under the applicable law. Indeed, the statute itself answers the question in the following clear and unambiguous language: "The provisions of this section shall not relieve the operator of an emergency vehicle from the duty to drive with due regard for the safety of all persons and property." General Statutes § 14-283 (d). Neither our common law nor any statute in Connecticut has ever conferred immunity on drivers in this context.

Our emergency vehicle statute, now codified at § 14-283, has existed in some form since 1925, and, under this statutory scheme, it *always* has been understood that the operator of an emergency vehicle remains subject to a legally enforceable duty of care, i.e., the operator enjoys no immunity from liability for the negligent operation of the emergency vehicle. The historical evidence, including this court's own precedent, demonstrates beyond any doubt that the majority's conferral of immunity in the present case is without basis in Connecticut law, as it has existed for nearly 100 years. The first version of the emergency vehicle statute, passed as chapter 79 of the Public Acts of 1925, applied to "[t]he driver or operator of an ambulance, while

answering a call or taking a patient to a hospital, and the driver or operator of a fire company or fire department while on the way to a fire," and gave such emergency vehicles "the right of way over all other traffic upon any public or private way." Public Acts 1925, No. 79, § 1 (P.A. 25-79). Unlike the current statute, P.A. 25-79 did not include any mention of a duty of care; it was not until 1971 that the legislature added subsection (d) to § 14-283, which expressly codified that duty. See Public Acts 1971, No. 538 (P.A. 71-538). But, from the beginning, this court always has held that drivers subject to the emergency vehicle statute owed a common-law duty of care to all other users of the roadway. The first case on this point was decided in 1932, when this court held that, under the emergency vehicle statute, the fact that an ambulance drove through a red light "did not, *of itself*, render negligent the act of its driver . . . ." (Emphasis added.) *Leete* v. *Griswold Post, No. 79, American Legion*, 114 Conn. 400, 407, 158 A. 919 (1932). The court then explained that "[i]t does not follow that [the emergency vehicle statute] confers a privilege to neglect the requirements of reasonable care, under the circumstances, in the operation of the excepted vehicles; the rate of speed or manner of operation in view of the conditions existing, or disregard of reasonably obvious hazards from or to other vehicles or to pedestrians may be such as to constitute negligence." Id. In other words, the duty of reasonable care remains during emergency operation.

The very next year, this court held that the trial court properly denied a plaintiff's request for a jury instruction that a volunteer firefighter acting in an emergency is not required to exercise the same degree of care as under ordinary circumstances. See *Tefft* v. *New York, New Haven & Hartford Railroad Co.*, 116 Conn. 127, 129, 133–34, 163 A. 762 (1933). The court reasoned that, "[w]hen an alarm of fire is sent out, it is of great importance that it be answered with celerity; but the driver of [a] fire apparatus, proceeding to a fire, is bound to exercise the care and control for his own safety and that of others which is reasonable under the circumstances." Id., 134. The driver of the fire truck is "required to use the care of a reasonably prudent man under the circumstances . . . ." Id. And, one year later, this court affirmed a judgment in a negligence case brought by a volunteer firefighter against the fire association and another firefighter when he was injured responding to a fire alarm. See *Voltz* v. *Orange Volunteer Fire Assn., Inc.*, supra, 118 Conn. 308–309. The defendants argued that, "because of the emergency existing when an alarm of fire was given to which the fire apparatus must respond without delay, the driver of the apparatus was not bound to exercise reasonable care for the safety of others . . . ." Id., 311. This court rejected that argument as "without merit," quoting *Tefft* for the proposition that the driver of a firetruck " 'is bound to exercise

the care and control for his own safety and that of others which is reasonable under the circumstances.' " Id.; see also *Matcheski* v. *Gutkin*, 19 Conn. Supp. 29, 32, 109 A.2d 879 (1954) ("[t]he fact that [the police officer responding to an emergency call] had the right of way did not excuse him from operating his car with reasonable care"); *Kittel* v. *Quish*, 15 Conn. Supp. 232, 232–34 (C.P. 1947) (notwithstanding provisions of emergency vehicle statute, driver of ambulance traveling at sixty miles per hour through stop sign was negligent).

On the basis of this historical review, I believe that we can conclude with near certainty that the addition of subsection (d) in 1971 to the emergency vehicle statute; P.A. 71-538; codified what was already a settled point of law in Connecticut: operators of emergency vehicles owe a legally cognizable duty of care to other persons on the roadways. It is no coincidence that the standard of care contained in § 14-283 (d) is the familiar negligence standard of care—the same standard that this court articulated in *Leete*, *Tefft*, and *Voltz*, and that applies every day in motor vehicle negligence cases in courthouses around the state. Section 14-283 (d) reflects an explicit and unequivocal statement by the legislature that considerations of public safety on our roads must always remain superior and paramount. Notwithstanding the fact that operators of emergency vehicles are accorded special privileges under subsections (a) through (c) of the statute, subsection (d) reminds us that those privileges do not preempt, supersede or otherwise displace (that is, "relieve the operator from") the cardinal rule applicable to all drivers at all times, which imposes a duty to operate one's vehicle with due care for the safety of others.

The most basic rules of construction teach that subsection (d) was included in the statute for a reason; *Pereira* v. *State Board of Education*, 304 Conn. 1, 58, 37 A.3d 625 (2012) (citing "the well-founded principle that we presume that the legislature acts intentionally when it includes certain words or provisions within a statute"); and courts cannot choose to ignore such a provision, treat it as superfluous, or render it meaningless by interpretive gloss. *American Promotional Events, Inc.* v. *Blumenthal*, 285 Conn. 192, 203, 937 A.2d 1184 (2008) ("[i]nterpreting a statute to render some of its language superfluous violates cardinal principles of statutory interpretation"); see also General Statutes § 1-1 (a) ("[i]n the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language"); *Maturo* v. *State Employees Retirement Commission*, 326 Conn. 160, 176, 162 A.3d 706 (2017) ("[w]hen a term is not defined in a statute, we begin with the assumption that the legislature intended the word to carry its ordinary meaning"). The words mean what they say.

What the words in § 14-283 (d) say is that a police

officer driving an emergency vehicle has a "duty to drive with due regard for the safety of all persons and property." General Statutes § 14-283 (d). The statute also tells us that the referenced duty is the *same* legal duty owed by *all* drivers, whether public or private, to operate their vehicles at all times with due regard for the safety of others.[59] See part II A of this opinion (discussing this duty of care). We know that it is the same duty that applies under routine conditions because the provision declares that the driving privileges afforded to emergency vehicle operators under the statute "*shall not relieve* the operator . . . *from the duty* to drive with due regard for the safety of all persons and property." (Emphasis added.) General Statutes § 14-283 (d). The statutory duty is the *same* duty that the driver had under nonemergency circumstances—the legal duty that, if breached, is enforceable in a negligence lawsuit. See part II A of this opinion. There is no "relief" from that duty when the driver is operating under emergency conditions.

If more is needed, there is a wealth of additional evidence that immunity does not operate to shield police officers from negligence liability when engaged in vehicular pursuit. One such item is the unanimous decision of this court in 1983, authored by Justice Peters, upholding a damages award when a jury found that two police officers had negligently operated their cruiser during an emergency pursuit. See *Tetro* v. *Stratford*, supra, 189 Conn. 604. The defendants argued on appeal that the usual principles of common-law tort liability "are, for emergency vehicles like police cars, superseded by the provisions of . . . § 14-283." Id., 607–608. This court rejected the argument in no uncertain terms: "[O]ur common law and our statutes do not confer upon police officers, whose conduct is negligent, blanket immunity from liability to an innocent bystander by virtue of their engagement in the pursuit of persons whom they believe to have engaged in criminal behavior." Id., 611. With respect to § 14-283 in particular, we stated: "The statute, in subsection (b), permits the operator of an emergency vehicle, in disregard of traffic laws, inter alia, to 'proceed past any red light or stop signal or stop sign . . . exceed the posted speed limits . . . and . . . disregard . . . regulations governing direction of movement or turning in specific directions.' The subsection limits even this authority, however, by providing that the operator, in passing through traffic lights, must slow down 'to the extent necessary for the safe operation of such [emergency] vehicle' and in exceeding normal speed limits, must 'not endanger life or property by so doing.' Furthermore, the statute expressly states, in subsection (d), that it 'shall not relieve the operator of an emergency vehicle from the duty to drive with due regard for the safety of all persons and property.' Read as a whole, the defendants contend, this statute limits their scope of duty

to incidents involving collisions with the emergency vehicle itself.

"We see no reason to read the words 'safety of all persons and property' so restrictively. Other courts, construing similar statutory language, have explained that emergency vehicle legislation provides only limited shelter from liability for negligence. *The effect of the statute is merely to displace the conclusive presumption of negligence that ordinarily arises from the violation of traffic rules. The statute does not relieve operators of emergency vehicles from their general duty to exercise due care for the safety of others. . . . We agree with this interpretation and conclude that § 14-283 provides no special zone of limited liability once the defendants' negligence has been established.*" (Citations omitted; emphasis added; footnote omitted.) Id., 608–10.

Especially in light of all of the other historical and statutory evidence, I firmly believe that *Tetro* controls the outcome of the present case. It confirms in plain terms that drivers of emergency vehicles owe the same duty to abstain from negligent conduct as they have always had under our emergency vehicle statute and at common law —that is, "their general duty to exercise due care for the safety of others." Id., 609. As Justice Peters explained: "The effect of the statute is merely to displace the conclusive presumption of negligence that ordinarily arises from the violation of traffic rules." Id. Thus, if a plaintiff's injuries arise in connection with a police chase or another emergency covered by § 14-283, the plaintiff cannot rely on a claim of per se negligence for violation of the designated statutes but, instead, is required to prove that the officers failed to exercise "due regard for the safety of all persons and property." General Statutes § 14-283 (d). Justice Peters concluded *Tetro* in the following unambiguous terms: "[Neither] our common law [nor] our statutes . . . confer upon police officers, whose conduct is negligent, blanket immunity from liability . . . by virtue of their engagement in the pursuit of persons whom they believe to have engaged in criminal behavior." *Tetro* v. *Stratford*, supra, 189 Conn. 611.

*Tetro* answers the question posed at the beginning of this discussion, which asked whether the usual liability rule applied to the negligent driving by municipal employees changes when the vehicle is operated under emergency conditions, as defined by § 14-283. *Tetro* explains that emergency driving is treated differently, but not because the operator is granted immunity when none previously existed. The difference, rather, is that the statute removes the availability of negligence per se under the designated motor vehicle laws and requires a plaintiff to show a violation of the "duty to drive with due regard for the safety of all persons and property." General Statutes § 14-283 (d). The Office of the Attorney

General understood *Tetro* precisely the same way in 1988. See Opinions, Conn. Atty. Gen. No. 88-032 (October 7, 1988) pp. 219–20 ("[A]lthough [§] 14-283 permits an officer to disregard certain traffic regulations, it does not relieve him of responsibility for causing a fatality. If the Commissioner [of Motor Vehicles] determines that the police officer was not answering an emergency call or in pursuit of fleeing law violators . . . was not using an 'audible warning signal device' . . . or was not operating with 'due regard for the safety of all persons and property' . . . then the officer is not relieved of liability for his negligence by [§] 14-283. This interpretation is supported by the court's opinion in *Tetro* . . . ." (Citations omitted.)).

The majority attempts to distinguish *Tetro* by pointing out that the municipal defendants in that case did not plead municipal immunity. It should be clear by now why this argument cannot withstand scrutiny. Municipal immunity was off the table in *Tetro* because the defense could not have been raised in good faith, not because everyone overlooked it. By the time that *Tetro* was decided, emergency vehicle drivers had been subject to negligence liability for fifty years. Immunity law, which would be codified by the legislature three short years after *Tetro* was decided, gave police officers no protection for negligent driving, emergency or otherwise, which is why the indemnification statutes had been enacted. The majority cannot and does not cite a single Connecticut case to the contrary. If immunity merely had been overlooked, but remained available in other cases to competent litigants—i.e., if the immunity question remained open even a crack, regardless of whether it had been raised by a party to the litigation—this court would not have categorically denounced the existence of any common-law or statutory "blanket immunity" in this context. *Tetro* v. *Stratford*, supra, 189 Conn. 611. I also have great difficulty believing that the defendant in *Tetro* would have overlooked the most basic and common defense in the municipal playbook had it been viable. In fact, it appears to me that everyone in *Tetro* understood the rules; the plaintiff knew that the town itself (unlike the individual defendants) enjoyed immunity and, therefore, sued the town only under the municipal indemnification statute, § 7-465.[60] See id., 602 n.1. The defendants raised their statutory and causation arguments precisely because the individual defendants had no immunity available. To summarize, the fact that municipal immunity was a nonissue in *Tetro* almost certainly was "a function of a failure to litigate the obvious [rather] than a failure to raise and decide the issue." *Paulus* v. *LaSala*, 56 Conn. App. 139, 150, 742 A.2d 379 (1999), cert. denied, 252 Conn. 928, 746 A.2d 789 (2000).[61]

The majority also fails to consider in a proper light the timing of *Tetro* relative to the enactment of § 52-557n just three years later. *Tetro* was the controlling

case on police liability for negligent pursuit at the time that the common law of municipal immunity was codified in § 52-557n. This chronology is telling. "Since the codification of the common law under § 52-557n, this court has recognized that it is not free to expand or alter the scope of governmental immunity therein." *Durrant* v. *Board of Education*, supra, 284 Conn. 107. We are bound to assume that *Tetro* was known to the legislature in 1986. See, e.g., *State* v. *Dabkowski*, 199 Conn. 193, 201, 506 A.2d 118 (1986) ("[the legislature] is presumed to know the existing state of the case law in those areas in which it is legislating . . . to be cognizant of judicial decisions relevant to the subject matter of a statute . . . and to know the state of existing relevant law when it enacts a statute" (citations omitted; internal quotation marks omitted)); 2B N. Singer & J. Singer, Statutes and Statutory Construction (7th Ed. 2008) § 50:1, p. 160 ("[a]ll legislation must be interpreted in the light of the common law and the scheme of jurisprudence existing at the time of its enactment"). The legislature, in other words, knew from *Tetro* that this court had unanimously held in 1983 that a municipality was liable under existing law for police negligence during pursuits. If the legislature wanted to establish an immunity rule for emergency vehicles generally or police pursuits in particular, it surely would have made some reference to such a scenario in the 1986 codification. Yet there is no mention of emergency vehicles, police pursuits, or *Tetro* anywhere in the legislative history, and no exception to liability is included in the enumeration of ten specific immunities contained in § 52-557n (b). Again, I have great difficulty imagining that the 1986 legislature would have remained silent if its intention was to confer immunity on those very same individuals on whom it had imposed a duty of care under §14-283 (d), particularly after this court unanimously held in *Tetro* that neither "our common law [nor] our statutes . . . confer upon police officers, whose conduct is negligent, blanket immunity from liability . . . by virtue of their engagement in the pursuit of persons whom they believe to have engaged in criminal behavior." *Tetro* v. *Stratford*, supra, 189 Conn. 611. This was the law when our immunity doctrine was codified in 1986, and this court is therefore bound to hold that municipal immunity does not apply to negligence during police pursuits.

Nor can I make sense of the majority's observation that *Tetro* was decided in 1983, prior to the codification of the common law in § 52-557n and without the benefit of the "dozens of cases" decided by this court since 1986 interpreting and applying that statute. I would have thought that this chronology would operate in the other direction, to *strengthen* the precedential force of *Tetro* in the present context. Here, we have a unanimous precedent, decided shortly before the enactment of § 52-557n, holding that a municipality is liable for its

employee's negligent operation of an emergency vehicle engaged in a police pursuit. Id. The legislature thereafter codified the then-existing common law governing municipal liability without so much as a whisper of any intention to impact, modify, or even address the law of vehicular negligence in general or the holding of *Tetro* in particular. Over the ensuing thirty-plus years, this court then decided "dozens" of cases involving § 52-557n—*none* of which even remotely has to do with municipal liability arising from a police vehicular pursuit. Yet suddenly we declare today that *Tetro* nonetheless has mysteriously met its demise, offstage and out of view.[62]

There is still more. The holding in *Tetro* conforms not only with our earlier case law construing Connecticut's emergency vehicle statute but also with the law in a substantial number of other states that have interpreted similar "duty" language contained in their own emergency vehicle statutes to impose negligence liability on police officers and other municipal employee drivers who fail to exercise due care in the operation of their vehicles during police pursuits. See *Robbins* v. *Wichita*, 285 Kan. 455, 466–67, 172 P.3d 1187 (2007) (citing fourteen states, including Connecticut, that apply ordinary negligence standard of care to this "duty" language). There is such plentiful statutory and case law on this issue from other states because nearly all states, including Connecticut in P.A. 71-538, modeled their emergency vehicle statutes on § 11-106 of the Uniform Vehicle Code (UVC). See National Committee on Uniform Traffic Laws and Ordinances, Traffic Laws Annotated (1972) § 11-106, statutory annotation, pp. 209–11 (explaining that forty-nine states have adopted some portion of § 11-106, with seventeen states adopting it in its entirety); Conn. Joint Standing Committee Hearings, Transportation, Pt. 3, 1971 Sess., p. 717, remarks of Lieutenant Michael Griffin of the Traffic Division of the Connecticut State Police (P.A. 71-538 "places definite responsibilities upon the operators of . . . emergency vehicles. This bill also brings the Connecticut law into conformance with the [UVC].").

The use of a negligence standard of care in this context is even more strongly indicated in Connecticut than in many other states, because Connecticut, unlike most other jurisdictions,[63] chose to retain the "due care" negligence standard without adding language contained in the UVC that could be interpreted to adopt a recklessness standard of care.[64] Our legislature's omission of the UVC's recklessness clause is meaningful. As a general matter, courts find significance in a state's decision to adopt a model act but deviate from a particular provision thereof. See, e.g., *Heraeus Medical GMBH* v. *Esschem, Inc.*, 927 F.3d 727, 737 (3d Cir. 2019) ("where the [legislature] omitted text from a borrowed statute, [this] offers strong evidence of legislative intent"); *Springfield Teachers Assn.* v. *Springfield School Direc-*

*tors*, 167 Vt. 180, 188 n.3, 705 A.2d 541 (1997) ("[o]rdinarily, when the [l]egislature models a statute after a uniform act, but does not adopt particular language . . . the omission was intentional such that the policy of the uniform act was rejected"); cf. *Viera* v. *Cohen*, 283 Conn. 412, 431, 927 A.2d 843 (2007) ("[t]ypically, the omission of a word otherwise used in the statutes suggests that the legislature intended a different meaning for the alternate term").

This rule of construction has been applied in the present context by those states that, like Connecticut, chose to adopt the "due care" standard in lieu of the UVC's recklessness standard. See *Harrison* v. *Mattapoisett*, 78 Mass. App. 367, 372–73 and n.4, 937 N.E.2d 514 (2010) (weighing sufficiency of evidence of police officers' negligence in personal injury case stemming from high speed police pursuit when state emergency vehicle statute requires police to exercise "caution and due regard under the circumstances for the [safety] of persons and property" and does not include recklessness language (internal quotation marks omitted)); *Alliance* v. *Bush*, Docket No. 2007CA00309, 2008 WL 2878321, *4 (Ohio App. July 21, 2008) ("due regard for the safety of all persons using the street or highway" language in emergency vehicle statute that, like Connecticut's, does not include recklessness language means "the driver of an emergency vehicle should operate the vehicle in the same manner as a reasonably prudent person under similar circumstances" (internal quotation marks omitted)); *Lowrimore* v. *Dimmitt*, 310 Or. 291, 297 and n.3, 797 P.2d 1027 (1990) (reversing summary judgment in favor of police officer involved in vehicular pursuit in light of Oregon's emergency vehicle statute, which "[does] not relieve the driver of an emergency vehicle or ambulance from the duty to drive with due regard for the safety of all other persons," because court "[could not] say, as a matter of law, that there [was] no evidence of negligence on the part of the pursuing officer" (internal quotation marks omitted)).[65]

The majority does not respond to the foregoing analysis of the statute. I honestly do not know what it means to say, as the majority does, that § 14-283 (d) "imposes a general duty on officers to exercise their judgment and discretion in a reasonable manner." Statutes typically do not contain precatory advice for healthy living, and, to the best of my knowledge, the legislature never has done so by borrowing the language of legal duty from negligence law. The majority correctly observes the fact that every law student learns the distinct and unmistakable meaning of such phrases as "due care" and its synonyms, but then fails to acknowledge what the students are taught, which is that these words, when used in association with the word "duty," are universally understood to describe a legally enforceable *liability* rule sounding in negligence. Indeed, the possibility that the legislature intended to impose an unenforce-

able "general duty" in this context becomes inconceivable against a historical background long recognizing the imposition of liability for the breach of that duty. Construing the statutory duty language suddenly to replace an existing liability regime with a newly fashioned immunity represents a complete inversion of the standard of care articulated in the statute, transforming subsection (d) from a traditional negligence rule into its exact opposite: blanket immunity from negligence liability.[66]

I understand the majority's desire to fit this case into the discretionary/ministerial framework of our governmental immunity law under § 52-557n. Despite that statute's proviso that its terms apply "[e]xcept as otherwise provided by law"; General Statutes § 52-557n (a); and notwithstanding our repeated pronouncement that subsection (a) codified then-existing immunity law, we continue to exhibit a compulsion to create a one-size-fits-all doctrine encompassing every aspect of municipal operations. See *Northrup* v. *Witkowski*, 332 Conn. 158, 190–203, 210 A.3d 29 (2019) (*Ecker, J.*, dissenting). This is unfortunate for numerous reasons, not the least of which is that it is inconsistent with what the legislature intended. I have already stated my view that vehicular negligence was never meant to be analyzed within the discretionary/ministerial framework. See part II A of this opinion. It simply makes no sense to try to pound that square peg into the discretionary/ministerial round hole, which likely explains why we never have attempted to do so in the past and why the legislature never indicated any intention to include vehicular negligence under the aegis of § 52-557n. Cf. *Elliott* v. *Waterbury*, 245 Conn. 385, 403, 715 A.2d 27 (1998) ("[T]his court generally presumes that the legislature, in adopting a statute, did not have the intention to effect a significant change in a fundamental common-law principle. . . . This presumption may be overcome if the legislative intent 'is clearly and plainly expressed.' . . . [H]owever, neither the text of § 52-557n (b) nor its legislative history yields a clear and plain expression of any intention to effectuate a significant change." (Citations omitted.))

The expression of public policy set forth in § 14-283 (d)—the retention of the duty of care for operators of emergency vehicles—should not be subject to judicial second-guessing. Put another way, any judicial preference for a different public policy (i.e., immunity from the negligence standard for operators of emergency vehicles), even if motivated by the laudable desire for across-the-board doctrinal uniformity, must yield in the face of the legislature's ultimate choice to value the safety of public users of the roadway over whatever additional marginal utility may result from the operation of emergency vehicles unrestrained by the negligence standard of care. See, e.g., *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, 316 Conn. 790, 803–804,

114 A.3d 1181 (2015) ("[i]t is not the province of this court, under the guise of statutory interpretation, to legislate . . . a [particular] policy, even if we were to agree . . . that it is a better policy than the one endorsed by the legislature as reflected in its statutory language").

In his concurring opinion, the Chief Justice offers an alternative reading of the liability and immunity rules produced where § 52-557n (a) (2) (B) intersects with § 14-283 (d). I take comfort in the fact that our views share substantial common ground. The Chief Justice's concurring opinion accurately observes that § 52-557n (a) expressly embraces all exceptions to its immunity rules "as [are] provided by law," and rightly concludes that § 14-283 (d), "which imposes on the operators of emergency vehicles certain obligations, including a 'duty to drive with due regard [for the safety of all persons],' functions as an exception to governmental immunity for discretionary acts pursuant to . . . § 52-557n (a) (2) (B)." The Chief Justice also agrees with "the proposition that driving is subject to a standing common-law exception to discretionary act immunity under § 52-557n (a) (2) (B). This includes driving an emergency vehicle in accordance with the privileges and responsibilities set forth by § 14-283 (d), which codifies the reasonable care standard . . . ." (Citations omitted.) I consider these views to be entirely consistent with my own.

To the extent that the Chief Justice's concurring opinion and this opinion diverge, the scope of that disagreement must remain uncertain at this time. The Chief Justice agrees with me that the discretionary act immunity does not apply to claims of negligence based on the *manner* in which the pursuit is conducted but takes the position, as does the majority, that the plaintiff has narrowed the issue in the present appeal to relate solely to the officer's threshold decision to initiate a pursuit, and nothing more. I have serious doubts, at both a conceptual and practical level, whether there is a workable distinction between an officer's decision to initiate a pursuit and the manner in which that pursuit is conducted. Because this case does not involve that distinction, however, I leave a discussion of that issue for another day.[67]

On the basis of the plain language of the emergency vehicle statute, our precedent holding drivers liable for negligence under the predecessors to that statute, and this court's unanimous holding in *Tetro*, I would reverse the judgment of the trial court.

### III

It follows from the foregoing analysis that the identifiable victim, imminent harm doctrine has no application to this case because Renaldi, while driving, owed the plaintiff's decedent a common-law and statutory duty

of care. The identifiable victim, imminent harm doctrine is an exception to immunity; there is no need for an exception when there is no immunity. Nonetheless, if I were to reach the identifiable victim, imminent harm exception, I would hold that it applies with full force on this record and certainly cannot be ruled out as a matter of law. Indeed, my view is that this is a paradigmatic case for the application of the exception.

The majority concludes that the plaintiff's decedent was not an identifiable victim for two reasons: (1) he did not belong to a foreseeable class of identifiable victims because he "was not legally compelled to get into the [pursued vehicle] and was a voluntary passenger in the vehicle," and (2) he was not an identifiable individual because the officer may not have seen him in the car, and, in any event, "in the context of a police pursuit, there will *always* be at least one person whose presence the police could or should be aware of—the driver of the pursued vehicle—[and] if we agreed with the plaintiff, the exception would swallow the rule." (Emphasis in original.) Neither point withstands analysis. I address each in turn.

The majority, quoting *Strycharz* v. *Cady*, 323 Conn. 548, 575–76, 148 A.3d 1011 (2016), explains that, under our cases, " 'a paramount consideration in determining whether the plaintiff was . . . [a] member of a foreseeable class of victims' " is " 'whether the plaintiff was compelled to be at the location where the injury occurred . . . .' " The majority then observes that "[w]e have thus far found this condition to be satisfied only in the case of schoolchildren attending a public school during school hours." The majority accurately describes the "compelled presence" requirement added to the identifiable victim, imminent harm doctrine by the court in recent years; unfortunately, in my view, the majority further entrenches this additional requirement without pausing to observe that the requirement (1) makes no sense from any perspective, logical or otherwise, and (2) did not exist when, by enacting § 52-557n in 1986, the legislature codified the identifiable victim, imminent harm doctrine without leave for future judicial emendation. It makes perfect sense that a legal requirement compelling the presence of a class of individuals at a particular time and place, and within a municipal employee's control, is a *sufficient* condition to make that class of individuals "identifiable" for purposes of imposing a duty of care to protect that class from a foreseeable risk of imminent harm. But it is a logical error to confuse sufficiency with necessity, and I entirely fail to understand why a "legally compelled presence" is a *necessary* prerequisite to qualifying as an identifiable class. Having a daughter is sufficient to make a person a parent, but it is not a necessary condition to parenthood—having a son will also count. Likewise, there are various ways that the generic duty owed by a municipal employee to the public-at-large can

become a particularized duty attaching to a readily identifiable class of persons likely to sustain imminent harm if the employee is negligent. Until recently, our case law construing the identifiable victim, imminent harm doctrine took this obvious point for granted.

A brief historical review will once again demonstrate how far we have strayed in the recent past from the common-law doctrine, as approved and codified by our legislature in 1986. The identifiable victim, imminent harm doctrine was first articulated in Connecticut shortly before § 52-557n was enacted. The doctrine recognizes that an official's discretionary duty owed to the public-at-large, and therefore subject to immunity for negligent performance, can become an actionable duty unprotected by immunity. The transition occurs when the need for the employee to act becomes "clear and unequivocal" because it should be apparent to the employee that the failure to take action subjects an identifiable victim or class of victims to an imminent risk of harm. As summarized by this court in *Shore* v. *Stonington*, 187 Conn. 147, 444 A.2d 1379 (1982): "We have recognized the existence of such [a] duty in situations [in which] it would be apparent to the public officer that his failure to act would be likely to subject an identifiable person to imminent harm. See *Sestito* v. *Groton*, [supra, 178 Conn. 528]. *Sestito* involved a policeman who waited and watched a public disturbance without interfering until the plaintiff's decedent was shot. Resolving conflicting testimony on the issue of imminence of harm in favor of the plaintiff, we held that the case should then have been submitted to the jury." *Shore* v. *Stonington*, supra, 153. As we observed in *Shore*, in order to fall within the exception, the municipal employee must "have been aware that [the tortfeasor's] conduct threatened an identifiable victim with imminent harm," otherwise "[t]he plaintiff's cause of action fails . . . for want of a ministerial or a clear and unequivocal discretionary duty." Id., 154. *Shore* involved a police officer who decided not to arrest a driver named Mark Cugini despite signs of inebriation. Id., 150. Cugini caused a fatal accident approximately forty-five minutes later. Id., 151. Over Justice Peters' dissent, the majority in *Shore* determined that the officer's exercise of discretion not to arrest Cugini was entitled to immunity because a jury could not reasonably find that the officer "could have been aware that Cugini's conduct threatened an identifiable victim with imminent harm." Id., 154; see also id., 157–63 (*Peters, J.*, dissenting).

*Sestito* and *Shore* establish that, although a municipal employee's discretionary "public" duty ordinarily creates no duty of care owed to any particular person, that duty can "[precipitate] into a special [duty] to prevent harm to an individual" upon "a showing of imminent harm to an identifiable victim." Id., 156. There was nothing provisional or contingent about the exception,

and it was well-known to the legislature in 1986, when our municipal immunity doctrine was codified.[68] Neither of these cases says a single word about a requirement that, to be identifiable, a victim or class of victims must be compelled by law to be present at the location and the time of the injury. In fact, had such a requirement existed, it would have required reversal in *Sestito* and a summary affirmance in *Shore* because, in both cases, the plaintiffs' decedents voluntarily were present at the locations at which they were injured. See id., 151 (plaintiff's decedent was injured in collision on public expressway); *Sestito* v. *Groton*, supra, 178 Conn. 522–23 (plaintiff's decedent was among group of men drinking, arguing, and "scuffling" in parking lot adjacent to bar). The truth is that we made the requirement up, out of thin air, years after the doctrine was codified by the legislature and notwithstanding our professed inability to "expand or alter" the doctrine once it had been codified. *Durrant* v. *Board of Education*, supra, 284 Conn. 107; see id. (stating, in context of discussing identifiable victim, imminent harm exception, that "this court has recognized that it is not free to expand or alter the scope of governmental immunity [contained in § 52-557n]").

A number of our other cases addressing the identifiable victim, imminent harm exception illustrate the same point. There is no mention of any "legally compelled presence" requirement in *Edgerton* v. *Clinton*, 311 Conn. 217, 86 A.3d 437 (2014). See id., 231 (holding that passenger in car, who was injured in vehicular chase supervised by 911 dispatcher, did not come within identifiable victim, imminent harm exception, not because passenger was in car voluntarily, but because it would not have been apparent to 911 dispatcher that her failure to act would have subjected identifiable victim to imminent harm). Nor is the concept mentioned in *Evon* v. *Andrews*, 211 Conn. 501, 559 A.2d 1131 (1989). See id., 502, 508 (holding that tenants killed in fire at multifamily dwelling as result of allegedly negligent inspection did not come within identifiable victim, imminent harm doctrine, not because they occupied building voluntarily, but because "[t]he class of possible victims of an unspecified fire that may occur at some unspecified time in the future is by no means a group of 'identifiable persons' within the meaning of *Shore*"). Indeed, this court repeatedly has stated that determining whether a plaintiff is within a class of identifiable victims requires consideration of multiple factors. See *Durrant* v. *Board of Education*, supra, 284 Conn. 101 ("[i]n delineating the scope of a foreseeable class of victims exception to governmental immunity, our courts have considered numerous criteria, including the imminency of any potential harm, the likelihood that harm will result from a failure to act with reasonable care, and the identifiability of the particular victim" (internal quotation marks omitted)); *Grady* v. *Somers*, supra, 294 Conn. 351 (same); *Burns* v. *Board of Educa-*

*tion*, 228 Conn. 640, 647, 638 A.2d 1 (1994) (same), overruled in part on other grounds by *Haynes* v. *Middletown*, 314 Conn. 303, 101 A.3d 249 (2014).

It strikes me as inconceivable that *Edgerton* and *Evon*, like *Sestito* and *Shore* before them, could have been written as they were if the legal doctrine under review—the identifiable victim, imminent harm exception to the municipal immunity doctrine—had no possible application in the case, as a matter of law, for the simple reason that the plaintiff was not legally compelled to be present at the time and location of the underlying events. I understand that this court ordinarily will take up a case as presented to the trial court and as framed by the parties to the appeal, and I suppose there exists a remote possibility that the trial courts and parties in *Sestito*, *Shore*, *Evon*, *Edgerton*, and the numerous other cases that have addressed the requirements of the identifiable victim, imminent harm doctrine have entirely overlooked a plain fact of dispositive significance. It also is possible, perhaps, that this court would have engaged in an entirely unnecessary doctrinal analysis in these cases without so much as a footnote drawing attention to the pig in the parlor. It seems far more likely, however, that the putative "requirement" of a legally compelled presence was not mentioned in these cases because it is not a requirement at all.

In fairness to the majority, the path leading to its doctrinal error on this point has been under judicial construction since 2005, and, since then, it slowly has been broadened in a process of expansion consistent with the numerous other doctrinal innovations described and criticized in part I of this opinion. Although postcodification cases such as *Evon* and *Edgerton* quite clearly do not consider the identifiable victim, imminent harm exception to include a "legally compelled presence" requirement, there are other cases following a different course. Ironically, these cases turn the doctrine on its head, and it is unfortunate that the majority chooses to follow them rather than adhere to the doctrine as originally formulated.

The first reference to the plaintiff's involuntary presence as part of the identifiable victim analysis was made in 1994, *in support of* this court's holding that the exception applied in the case rather than as a basis for rejecting its application. See *Burns* v. *Board of Education*, supra, 228 Conn. 649 ("[t]he presence of the plaintiff child on the school premises where he was injured was not voluntary"); see also *Purzycki* v. *Fairfield*, 244 Conn. 101, 109, 708 A.2d 937 (1998) (citing *Burns* for proposition that "schoolchildren who are statutorily compelled to attend school, during school hours on school days, can be an identifiable class of victims"), overruled in part on other grounds by *Haynes* v. *Middletown*, 314 Conn. 303, 101 A.3d 249 (2014).[69]

What began as a basis for finding that the plaintiff fell within a foreseeable class of identifiable victims became, ten years later, a convenient if unwarranted means to limit the doctrine. In other words, what began as a sufficient condition to qualify as an identifiable victim later became a necessary condition. This trend began in 2005, when the court decided as a "policy" matter to exclude parents injured on school grounds from the class of identifiable victims who could sue for negligence. See *Prescott* v. *Meriden*, 273 Conn. 759, 760–61, 764–65, 873 A.2d 175 (2005) (holding that father who slipped on wet bleachers while attending his son's high school football game was not identifiable victim because his "presence at the game was purely voluntary"); see also *Durrant* v. *Board of Education*, supra, 284 Conn. 94, 108 (holding that parent picking up her six year old daughter from after-school program was not identifiable victim because both she and her daughter were on premises "voluntarily," and, therefore, she could not recover for injuries sustained when she slipped in puddle of water on staircase on school premises). It was only a matter of time before the new requirement of a legally compelled presence was applied to plaintiffs in other contexts, as well. See, e.g., *St. Pierre* v. *Plainfield*, 326 Conn. 420, 438, 165 A.3d 148 (2017) ("[T]he plaintiff was in no way compelled to attend the aqua therapy sessions provided [at the municipal pool]. . . . Under established case law, this choice precludes us from holding that the plaintiff was an identifiable person or a member of an identifiable class of persons."); *Grady* v. *Somers*, supra, 294 Conn. 356 ("we conclude that the plaintiff is not a member of a class of foreseeable victims because, as he acknowledges, he was not legally required to dispose of his refuse by taking it to the transfer station personally and could have hired an independent contractor to do so").

No reason or justification exists for limiting an identifiable class of victims to persons who are legally compelled to be present at the time and place of the negligent act or omission. The duty at issue does not become actionable because the victim is present involuntarily.[70] It becomes actionable because it should be apparent to the municipal employee that an abstract risk has become sufficiently particularized such that the employee must act in order to protect the person(s) likely to suffer harm imminently. In the language of *Shore*, following *Sestito*, the discretionary duty owed to the public "precipitates" into a clear and unequivocal duty to a particular person or class of persons when the harm is imminent and the likely victim is known or knowable. *Shore* v. *Stonington*, supra, 187 Conn. 156. *One* of the ways that the employee's generalized duty precipitates into a particularized one is when the would-be victim is legally required to be present in the dangerous situation, as we have said is the case with schoolchildren attending public schools. But a

moment's reflection demonstrates that there are many other circumstances that will also make apparent the need to protect a particular person or persons from the risk of imminent harm. See *Durrant* v. *Board of Education*, supra, 284 Conn. 101 ("[i]n delineating the scope of a foreseeable class of victims exception to governmental immunity, our courts have considered numerous criteria, including the imminency of any potential harm, the likelihood that harm will result from a failure to act with reasonable care, and the identifiability of the particular victim" (internal quotation marks omitted)). A police chase is a perfect example.

There is no question that police pursuits are extremely dangerous undertakings. In 2003 alone, there were an estimated 35,000 police pursuits across the country, 14,000 of which resulted in crashes. P. O'Connor & W. Norse, "Police Pursuits: A Comprehensive Look at the Broad Spectrum of Police Pursuit Liability and Law," 57 Mercer L. Rev. 511, 511 (2005). From 1996 to 2015, police pursuits resulted in more than 6000 fatal crashes with more than 7000 deaths; this is an average of 355 deaths per year, or about one per day. B. Reaves, Bureau of Justice Statistics, Office of Justice Programs, United States Department of Justice, Special Report: Police Vehicle Pursuits, 2012–2013 (May, 2017) p. 6, available at http://www.bjs.gov/content/pub/pdf/pvp1213.pdf (last visited June 22, 2020). In Connecticut over this same time period, fifty-eight people died as a result of police pursuits. Id., p. 13.

Pursuits are especially dangerous for the occupants of the pursued vehicle, like the teenager who lost his life in the pursuit giving rise to the present case. The United States Department of Justice reports that, between 1996 and 2015, 65 percent of pursuit-related fatalities involved occupants of the pursued vehicle. Id., p. 6. In Connecticut, thirty-four of the fifty-eight fatalities during that period, or over 58 percent of pursuit-related fatalities, involved occupants of the pursued vehicle. Id., p. 13. The Department of Justice also estimates that, in pursuits occurring between 2009 and 2013 that resulted in serious injuries, over three quarters of those injuries occurred to the suspect being pursued. Id., p. 7.

The legislature is well aware of the dangers inherent to police pursuits and has acted repeatedly to regulate them and reduce their frequency. In 1978, the legislature required every municipality in the state to adopt a policy for handling police pursuits. Number 78-372 of the 1978 Public Acts (P.A. 78-372), codified as amended at General Statutes § 14-283a, mandated that each policy "shall specify which driving, support and other police tactics may be employed in the case of a pursuit." P.A. 78-372, § 1. It is clear from the legislative history that concern over the danger of such pursuits—including the danger to occupants of the pursued vehicle—was a primary

motivation for the act's passage. Senator Mary A. Martin, a sponsor of the 1978 act, lamented: "We frequently see in the papers articles on high speed chases and these chases are usually initiated because of minor traffic violation[s] or even a suspected violation. The drivers of these vehicles are challenged to the point where they will increase their speed. The car may have been stolen and if so, what good is a wrecked car to the owner? Or the car may have a light out or the driver may have been drinking. What justification can there possibly be for a high speed chase in these circumstances? Is it worth a life or injury to the occupants?" 21 S. Proc., Pt. 8, 1978 Sess., pp. 2945–46. Senator Betty Hudson echoed Senator Martin's concerns: "I believe [this] bill really arose because of the high speed chase and fatality that occurred in Madison . . . which is my hometown; and I agree . . . [that] there ha[s] been a lack of training for police officers throughout the state regarding the whole issue of high speed police chase[s]. . . . We have seen far, far too many accidents and deaths occur because of high speed police chase[s] involving young people, involving the police officers themselves. Many, many persons are threatened and their lives are endangered because of these kinds of pursuits." Id., pp. 2940–41.

The legislature expressed further concern in 1999, when it amended § 14-283a to require the creation of "a uniform, [statewide] policy for handling pursuits by police officers." Public Acts 1999, No. 99-171, § 1, codified at General Statutes § 14-283a (b). During debate in the Senate, the bill's proponent, Senator Alvin W. Penn, explained: "We're talking about a guideline for police behavior. We're talking about . . . a policy that's long overdue in the significance of saving a life, particularly [that] of an innocent." 42 S. Proc., Pt. 8, 1999 Sess., p. 2670. Echoing the concern that arose during debate on P.A. 78-372—that the police were initiating pursuits over minor offenses—Senator Penn argued: "[There are] too many activities where a pursuit may go through that somebody ran a stop sign or somebody ran a stop light or somebody may or may not have marijuana, somebody may have done that and put the officer's life in jeopardy and an innocent life in jeopardy. And I think that's what we're talking about, putting a safety mechanism in place." Id., p. 2675. Senator Eric D. Coleman shared Senator Penn's concerns: "[T]he fact of the matter is that high speed police pursuits endanger life and limb. And it would seem to make sense to me that we ought to try to do something in order to make those kinds of situations less potentially catastrophic to innocent citizens. And it's for that matter that I would support this proposal." Id., p. 2693.

Debate on the statewide policy in the House of Representatives evinced similar concerns. Representative Stephen D. Dargan, the proponent of the bill in that chamber, remarked: "There [have] been some incidents

in . . . Connecticut, whereby there [have] been some tragic deaths from the pursuit of [the] law enforcement community. I stand here today to say this bill is to help protect not only the innocent that have been killed within some of these police pursuits, but to protect the law enforcement community within our [state] and our respected municipalities that serve and protect [twenty-four hours a day], 365 days a [year]." 42 H.R. Proc., Pt. 14, 1999 Sess., p. 4880. Representative Ernest E. Newton II, encouraging passage of the bill, reminded his colleagues: "This bill means that we might save your [child's], your [friend's], your neighbor's life." Id., p. 4886.

The potential danger of police pursuits remains an ongoing concern in the legislature.[71] In 2018, the legislature amended § 14-283a to require the police to report every pursuit engaged in and to require annual reports from each chief of police and the Commissioner of Emergency Services and Public Protection. See Public Acts 2018, No. 18-161, § 3. And, in 2019, the legislature again amended § 14-283a, mandating updates to the statewide pursuit policy every five years and adding specific requirements concerning police conduct during chases. See Public Acts 2019, No. 19-90, § 5. In support of one aspect of the 2019 legislation, Representative Steven Stafstrom, the proponent of the bill in the House of Representatives, explained: "I know that a lot of [police] departments in the [s]tate have issued policies with respect to police pursuits, the exact reason being that . . . the data [have] shown that in fact police pursuits are more likely to cause death or serious injury or to result in undesirable outcomes then they are to achieve by engaging in the pursuit. . . . [T]here [have] been at least six deaths in Connecticut after police vehicle pursuits in 2017 alone . . . ." 62 H.R. Proc., Pt. 11, 2019 Sess., p. 9197.

The fatal accident that led to the present case is precisely the type of tragedy the legislature was concerned with preventing when it promulgated and amended § 14-283a. The plaintiff should have been allowed to present her claim to the jury because her decedent, as a passenger in the pursued vehicle, unquestionably was a member of an identifiable class of foreseeable victims. If the young occupants of the Mustang convertible being pursued at a high rate of speed do not qualify as members of an identifiable class of likely victims, then the doctrine has become an absurdity. The likely harm—a fatal automobile accident—is obvious and imminent, and the likely victims—the occupants of the pursued vehicle—consist of a number small enough to be counted on one hand. This is precisely a "[situation in which] it would be apparent to the public officer that his [negligent acts or omissions] would be likely to subject an identifiable person to imminent harm." *Shore* v. *Stonington*, supra, 187 Conn. 153.

This brings me to the other reason given by the majority for concluding that the plaintiff's decedent was not identifiable. The majority observes that it is possible that Renaldi did not know that there was a backseat passenger in the Mustang convertible; he testified during his deposition that he was focused on other things. But this point stalls quickly, probably because the majority realizes that we must draw all reasonable inferences in favor of the plaintiff at this stage of the litigation, and a jury could easily conclude on this record that Renaldi was aware that there were passengers in the vehicle who plainly would qualify as identifiable victims. The majority therefore turns to an alternative point, which is that "public policy" requires us to hold against the plaintiff because, otherwise, every police chase will involve identifiable victims and "the exception would swallow the rule."

I am at a loss to understand why the putative public policy favoring an officer's exercise of discretion to engage in a high speed chase should trump the legislature's expressed public policy preference favoring public safety over the apprehension of the occupants of a pursued vehicle. The majority's conclusion is not supported by case law, common sense, or any legislative enactment of which I am aware. It appears to assume a nonexistent "rule" favoring the exercise of unlimited discretion in police pursuits and then decrees that the identifiable victim, imminent harm "exception" will swallow that rule "because in the context of a police pursuit, there will *always* be at least one person whose presence the police could or should be aware of—the driver of the pursued vehicle . . . ." (Emphasis in original.) The argument assumes the point it purports to demonstrate.

The Chief Justice's concurring opinion takes a different tack but, in my view, ultimately suffers from the same fundamental flaw as the majority opinion by substituting its own policy preferences for those policies established by the legislature. The Chief Justice's concurring opinion acknowledges that, as a matter of logic alone, no one would be more of an identifiable person subject to imminent harm than the occupant of a car being pursued by the police. But the Chief Justice's concurring opinion then carves out an exception to the doctrine[72] in the form of an irrebuttable presumption deeming all voluntary (i.e., nonkidnapped) passengers in a fleeing vehicle to be "in cahoots with" the driver of that vehicle and concludes that passengers are therefore barred as a matter of policy from invoking the imminent harm, identifiable victim doctrine. The Chief Justice's concurring opinion reaches this conclusion as a matter of what it considers to be good public policy. The problem with this approach is that the policy declaration made in the concurring opinion has no basis in Connecticut law and bears no connection to the facts

of this case. Although presented as a policy informed by restraint and fashioned in deference to legislative prerogative, I believe that the Chief Justice's concurring opinion actually imposes its own policy preference in lieu of the legislative policies set forth in §§ 14-283 and 14-283a.

The Chief Justice's concurring opinion begins with the proposition that "whether a particular plaintiff comes within a cognizable class of foreseeable victims for purposes of [the identifiable victim, imminent harm] exception . . . is ultimately a question of policy for the courts, in that *it is in effect a question of duty* . . . [that] involves a mixture of policy considerations and evolving expectations of a maturing society . . . ." (Emphasis added; internal quotation marks omitted.) Part II of Chief Justice Robinson's concurring opinion, quoting *Prescott* v. *Meriden*, 273 Conn. 759, 763–64, 873 A.2d 175 (2005). But the Chief Justice's concurring opinion then overlooks the single most important indicator of our state's public policy on this precise issue— the explicit text of § 14-283 (d), which provides in relevant part that a police officer pursuing a fleeing suspect has "the duty to drive with due regard for the safety of *all persons* and property." (Emphasis added.) "[A]ll persons" means everyone; the legislature did not qualify or limit the class of individuals to whom the duty is owed, and, in my view, it is not for the judiciary to devise exceptions to this legislative policy choice. Cf. *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, supra, 316 Conn. 803–804 ("[i]t is not the province of this court, under the guise of statutory interpretation, to legislate . . . a [particular] policy, even if we were to agree . . . that it is a better policy than the one endorsed by the legislature as reflected in its statutory language").

In light of the legislature's powerful statement of public policy in § 14-283 to protect *all* potential victims from the inherent dangers posed by high speed police pursuits, it is clear that the legislature has chosen to adopt a public policy establishing the priority of roadway safety with respect to *all* foreseeable victims of that activity, including the passengers in the pursued vehicle. Rather than confronting the clear legislative intent expressed in § 14-283, the Chief Justice's concurring opinion retreats, ironically, to generic concerns about respecting the legislative prerogative. In my view, the legislature need not "amend our governmental immunity and motor vehicle statutes to waive immunity and to allow a private right of action," as the Chief Justice suggests, because a private right of action already exists. Indeed, the premise of our policy inquiry in this context is that the legislature has *not* taken definitive action—this is why the question comes to us at all. There is no need for the legislature to create a "private right of action" against individual defendants because that right, sounding in negligence, has existed

in the common law since emergency vehicles first began using the roads, and the corresponding cause of action against the municipality itself exists under the various municipal indemnification statutes, including § 7-465. Stated simply, the Chief Justice's concurring opinion, which carves out an exception to the duty of care for the occupants of the vehicle pursued by the municipal defendants, finds no support in Connecticut law.

The "in cahoots" policy proposed by the Chief Justice's concurring opinion conflicts in yet another way with existing Connecticut public policy, this time a policy embedded in legal doctrine established by this court. In *Greenwald* v. *Van Handel*, 311 Conn. 370, 88 A.3d 467 (2014), this court adopted the "wrongful conduct" rule, which prohibits a plaintiff from tort recovery if his or her injuries arose "from the legal consequences of the plaintiff's volitional criminal conduct . . . ."[73] Id., 385. Thus, a passenger in the pursued vehicle is prohibited from recovering damages in tort for his or her injuries if, but only if, he or she intentionally engaged in felonious activity in connection with the police pursuit. See id., 378–80 (explaining that rule applies only to preclude claims by persons guilty of intentional felonious conduct). The wrongful conduct rule plainly would not apply on this record because the plaintiff's decedent, a backseat passenger in the pursued vehicle, is not even alleged to have committed any crimes, much less a serious felony; nor is there any allegation that he had any role whatsoever in aiding or encouraging the driver's decision to engage in the pursuit. I am troubled that we would find the need to fashion a brand new doctrinal innovation, the "in cahoots" doctrine, as a custom-tailored public policy declaring that a plaintiff's mere status as a passenger somehow operates to defeat his ability to seek tort compensation from the persons whose carelessness proximately caused his injuries. I am unaware of any rule of law or public policy that would support such a conclusion. To the contrary, our law—common-law and statutory alike—supports the opposite conclusion.

The Chief Justice's concurrence cites numerous out-of-state cases in support of its "in cahoots" policy concerning police liability for injuries to passengers in fleeing vehicles. None of the cases is helpful in connection with the subject at hand, however, because none of them involves Connecticut public policy on this issue; nor do they involve the application of Connecticut's rather idiosyncratic identifiable victim, imminent harm exception. The out-of-state cases are also factually distinguishable in one or more vitally important ways. For example, the Chief Justice's concurring opinion relies on *Sellers* v. *Abington*, 630 Pa. 330, 347–48, 106 A.3d 679 (2014), for the proposition that the law must not impose a duty on officers to unknown passengers in a fleeing vehicle for reasons of public policy. Even if that highly dubious proposition were true in Connecticut—

even if an officer has no duty to learn whether his or her decision to give chase may put the lives of passengers at risk—the facts in the present case do not fit that hypothetical fact pattern because, in the present case, the parties hotly dispute whether the pursuing officers were aware that the Mustang convertible contained passengers.[74] *Sellers* is distinguishable on this ground. See id., 355 (Todd, J., concurring) ("[t]he majority expressly conditions its assessment of [the] factor [regarding the relationship between the parties] on the fact that 'the officer was unaware of the presence of a passenger,' but does not indicate whether it would reach the same conclusion if the presence of a passenger was known, but the relationship of the passenger to the driver was not known").

Likewise, *Robinson* v. *Detroit*, 462 Mich. 439, 613 N.W.2d 307 (2000), is plainly distinguishable on numerous fronts, and the only relevant aspect of the case actually supports reversal here. In no uncertain terms, *Robinson* states that the pursuing officers owe a duty of care to passengers who are not themselves wrongdoers: "[W]e hold that the police owe a duty to innocent passengers, but owe no duty to passengers who are themselves wrongdoers whether they help bring about the pursuit or encourage flight." Id., 444.[75] *Robinson* also expressly states that, to the extent that a question of fact exists regarding whether a passenger is "innocent," summary judgment is inappropriate. See id., 452–53 ("the issue of the passengers' status has not been sufficiently developed, thereby making summary disposition on the basis of duty inappropriate at this time").[76] *Robinson* therefore supports my conclusion that the trial court improperly rendered summary judgment in favor of the defendants. The other cases briefly cited by the Chief Justice's concurring opinion similarly provide no useful guidance here.[77]

The Chief Justice's concurring opinion also echoes the concern, articulated in some of the out-of-state cases, that it would be unworkable and unduly burdensome to require police officers to first determine whether there are passengers in a vehicle before giving chase. Even assuming for the sake of argument that this concern should predominate over roadway safety, Connecticut law already accounts for it, because a plaintiff seeking to invoke the identifiable victim, imminent harm exception must demonstrate that the danger to the plaintiff arising from the alleged negligence *should have been apparent* to the defendant. See *Edgerton* v. *Clinton*, supra, 311 Conn. 231 ("In order to meet the apparentness requirement, the plaintiff must show that the circumstances would have made the government agent aware that his or her acts or omissions would likely have subjected the victim to imminent harm. . . . This is an objective test pursuant to which we consider the information available to the government agent at the time of her discretionary act or omis-

sion." (Citation omitted.)). Once again, there is no need for the innovation proposed by the Chief Justice because existing law already provides the necessary policy-based limitations.

Second, and more concretely, the Chief Justice's concurring opinion addresses a hypothetical policy concern that may arise in some other case but that is not present in the case before us. If a case arises in which there is either (1) insufficient evidence to prove that the pursuing officer was aware of any passengers in the pursued vehicle, or (2) evidence that the plaintiff-passenger himself may be a wrongdoer, then we might wish to consider a policy-based rule barring recovery. In the present case, the officers were pursuing the driver of an open convertible for a minor traffic violation. On this record, it makes no sense to consider, much less adopt, the counterfactual legal presumption proposed by the Chief Justice. At the very least, the question of whether the officer was aware of the passengers and whether the passengers were "in cahoots" with the driver's act of flight should be left to the trier of fact.

The real "rule" at issue in the identifiable victim, imminent harm analysis is the one set forth in the plain language of § 52-557n, which is that a municipality is liable for the negligent acts or omissions of its employees. There is an exception to that rule for "negligent acts or omissions which require the exercise of judgment or discretion . . . ." General Statutes § 52-557 (a) (2) (B). But then there is an exception to the exception, which applies when an employee's discretionary acts expose a foreseeable victim to an imminent risk of harm. The majority agrees that the exception applies here because "there will *always* be at least one person whose presence the police could or should be aware of—the driver of the pursued vehicle"; (emphasis in original); but refuses to accept the consequences of that point.

There can be no question that the individuals in the pursued vehicle constitute a narrow class of readily foreseeable victims, and, therefore, the officer's duty to exercise reasonable care is "owe[d] . . . to the individual plaintiff, not just to the public in general." *Sestito* v. *Groton*, supra, 178 Conn. 527. The harm posed by a nighttime, high speed chase on rural roads is imminent, the potential injuries are catastrophic, the likelihood that the harm will eventuate is high, and the victims in the pursued vehicle are readily identifiable. See *Durrant* v. *Board of Education*, supra, 284 Conn. 101 (listing criteria used to delineate "the scope of a foreseeable class of victims exception to governmental immunity" (internal quotation marks omitted)). Indeed, the application of the exception particularly is appropriate in a case such as the present one, in which the officer's affirmative conduct (i.e., initiating the high speed chase), as opposed to his or her failure to act, caused

the imminent risk of harm to eventuate, resulting in bodily injury and death. But cf. *Evon* v. *Andrews*, supra, 211 Conn. 507–508 (identifiable victim, imminent harm exception was inapplicable when city officials failed to enforce fire safety laws); *Shore* v. *Stonington*, supra, 187 Conn. 157 (identifiable victim, imminent harm exception was inapplicable when officer failed to arrest drunk driver); *Sestito* v. *Groton*, supra, 528 (identifiable victim, imminent harm exception was applicable when officer failed to interrupt public disturbance).

This state has a strong public policy in favor of encouraging the safe operation of motor vehicles and discouraging police officers from initiating high speed chases for minor vehicular infractions. Nothing is to be gained and more lives will be lost if we grant immunity to officers who engage in such chases in a negligent manner contrary to the spirit and purpose of §§ 52-557n, 14-283, 14-283a, and our common-law history.

I respectfully dissent.

[1] Throughout this opinion, I use the terms "municipal employee immunity" and "municipal entity immunity" to highlight and maintain the important difference between the immunity of the municipal employee and the immunity of the municipality itself. I use the term "municipal immunity" when I refer to the doctrine generally, to encompass the immunity of both municipal employees and municipalities. We would benefit from greater linguistic and conceptual precision in this regard. Thus, the immunity doctrine applied to municipal employees has gone by different names in Connecticut. Usually, it is called either official immunity or qualified immunity; see, e.g., *Grady* v. *Somers*, 294 Conn. 324, 326, 984 A.2d 684 (2009) (referring to "a municipal employee's qualified immunity for discretionary acts"); though, sometimes, it is indiscriminately and inaccurately lumped together with the corporate (municipal entity) immunity under the rubric of "governmental" or "municipal" immunity. See, e.g., *Evon* v. *Andrews*, 211 Conn. 501, 507, 559 A.2d 1131 (1989) (referring to "the general rule of governmental immunity for employees engaged in discretionary activities"). Adding to the confusion, the common law historically distinguished between officials (or officers) and mere employees of a municipality for immunity purposes. See 1 E. Kinkead, Commentaries on the Law of Torts (1903) § 153, p. 348 ("we must have clearly in mind when a person is to be considered a public officer, for if he is not an official, he must be something else—as an employee—his liability depending, in such cases, upon different principles"). This officer/employee distinction evidently was abandoned in Connecticut, as elsewhere.

[2] See, e.g., *Northrup* v. *Witkowski*, 332 Conn. 158, 167, 210 A.3d 29 (2019) ("[t]he [common-law] doctrines that determine the tort liability of municipal employees are well established" (internal quotation marks omitted)); *Elliott* v. *Waterbury*, 245 Conn. 385, 411, 715 A.2d 27 (1998) ("under the common law . . . both municipalities and their employees or agents have immunity from negligence liability for governmental acts involving the exercise of judgment or discretion" (footnote omitted)).

[3] This court has stated on numerous occasions that § 52-557n codified the fundamental components of the municipal immunity doctrine, as established under the common law. See, e.g., *Violano* v. *Fernandez*, 280 Conn. 310, 320, 907 A.2d 1188 (2006) ("[t]he tort liability of a municipality has been codified in § 52-557n"); see also, e.g., *Durrant* v. *Board of Education*, 284 Conn. 91, 107, 931 A.2d 859 (2007) ("[s]ince the codification of the common law under § 52-557n [in 1986], this court has recognized that it is not free to expand or alter the scope of governmental immunity therein"); *Considine* v. *Waterbury*, 279 Conn. 830, 844, 905 A.2d 70 (2006) (concluding that § 52-557n (a) (1) (B) codified "municipal common-law liability for acts performed [by the municipality] in a proprietary capacity"). As *Considine* indicates, a more refined characterization of the statutory codification of municipal immunity is that subsection (a) of § 52-557n codified the existing common law of municipal immunity, whereas subsection (b) altered the common law in a limited set of context-specific circumstances. See *Considine* v. *Waterbury*, supra, 838–41. None of the situations enumerated in subsection (b) of § 52-

557n involves the operation of municipal motor vehicles.

[4] This assessment is not meant to include lawsuits seeking recovery for personal injuries or property damage caused by the negligent operation of a motor vehicle under routine conditions. See part II A of this opinion.

[5] It would risk overheating the printing press to include a complete list of such cases decided by this court and the Appellate Court since 1990. To conserve resources, I provide only a representative sampling of cases decided by this court. See, e.g., *Northrup* v. *Witkowski*, 332 Conn. 158, 188–90, 210 A.3d 29 (2019); *Ventura* v. *East Haven*, 330 Conn. 613, 640–42, 199 A.3d 1 (2019); *Martinez* v. *New Haven*, 328 Conn. 1, 11–12, 176 A.3d 531 (2018); *St. Pierre* v. *Plainfield*, 326 Conn. 420, 432–35, 165 A.3d 148 (2017); *Strycharz* v. *Cady*, 323 Conn. 548, 575, 148 A.3d 1011 (2016), overruled in part by *Ventura* v. *East Haven*, 330 Conn. 613, 199 A.3d 1 (2019); *Edgerton* v. *Clinton*, 311 Conn. 217, 235–36, 86 A.3d 437 (2014); *Coe* v. *Board of Education*, 301 Conn. 112, 122, 19 A.3d 640 (2011); *Grady* v. *Somers*, 294 Conn. 324, 356–57, 984 A.2d 684 (2009); *Cotto* v. *Board of Education*, 294 Conn. 265, 279–80, 984 A.2d 58 (2009); *Durrant* v. *Board of Education*, supra, 284 Conn. 108–11; *Violano* v. *Fernandez*, 280 Conn. 310, 327–28, 907 A.2d 1188 (2006); *Doe* v. *Petersen*, 279 Conn. 607, 620–21, 903 A.2d 191 (2006); *Evon* v. *Andrews*, 211 Conn. 501, 506–508, 559 A.2d 1131 (1989).

[6] See part III of this opinion.

[7] See, e.g., *Blonski* v. *Metropolitan District Commission*, 309 Conn. 282, 286, 71 A.3d 465 (2013) (defendant's negligent actions were connected to its proprietary function, and, therefore, defendant was liable under § 52-557n (a) (1) (B)); *Ugrin* v. *Cheshire*, 307 Conn. 364, 387, 54 A.3d 532 (2012) (plaintiffs were not precluded from bringing action for negligent inspection under § 52-557n (b) (8) when municipality was on notice of hazardous condition). In addition, statutory claims against municipal defendants exist outside of the scope of the municipal immunity doctrine. See, e.g., General Statutes § 13a-149 (highway defect statute).

[8] See *Northrup* v. *Witkowski*, 332 Conn. 158, 166, 189–90, 210 A.3d 29 (2019) (overruling *Spitzer* v. *Waterbury*, 113 Conn. 84, 154 A. 157 (1931)); see also id., 190–91, 201–202 (*Ecker, J.*, dissenting).

[9] See *Ventura* v. *East Haven*, 330 Conn. 613, 634–37, 199 A.3d 1 (2019) (holding that immunity issues ordinarily present issue of law, disavowing line of earlier cases stating that issue of whether acts or omissions are discretionary or ministerial ordinarily presents issue of fact for jury).

[10] Thus, a nonsupervisory municipal employee engaged in a routine task—shoveling snow or opening a hallway door, for example—enjoys the same insulation from ordinary negligence liability as a public official enjoys from being ordered by a judge to do (or not to do) some act within the scope of the official's discretionary authority. The comparison, while startling, unfortunately is neither hyperbolic nor accidental. The strict definition of a "ministerial act" required to overcome municipal employee immunity is effectively a mandamus standard. Compare *Ventura* v. *East Haven*, 330 Conn. 613, 631, 199 A.3d 1 (2019) ("to demonstrate the existence of a ministerial duty on the part of a municipality and its agents [in a negligence action], a plaintiff ordinarily must point to some statute, city charter provision, ordinance, regulation, rule, policy, or other directive that, by its clear language, compels a municipal employee to act in a prescribed manner, without the exercise of judgment or discretion" (internal quotation marks omitted)), with *AvalonBay Communities, Inc.* v. *Sewer Commission*, 270 Conn. 409, 422, 853 A.2d 497 (2004) ("[A] writ of mandamus will lie only to direct performance of a ministerial act which requires no exercise of a public officer's judgment or discretion. . . . Furthermore, where a public officer acts within the scope of delegated authority and honestly exercises her judgment in performing her function, mandamus is not available to review the action or to compel a different course of action." (Internal quotation marks omitted.)). Something has gone very wrong when our municipal immunity doctrine has blindly collapsed these two legal standards from the extreme opposite ends of the judicial remedial spectrum—one a routine damages award used every day to compensate any person who has sustained real and demonstrable physical harm as a result of a defendant's negligent performance of routine tasks like shoveling snow or opening a hallway door, the other an extraordinary writ involving the exercise of direct judicial control to command or prohibit a government official from taking a particular action.

[11] See, e.g., *Ventura* v. *East Haven*, 330 Conn. 613, 617, 640–42, 199 A.3d 1 (2019) (reversing judgment awarding plaintiff $6 million, rendered after jury rejected municipal immunity defense in personal injury case on basis

of negligence); *Edgerton* v. *Clinton*, 311 Conn. 217, 219–21, 86 A.3d 437 (2014) (reversing approximately $13 million judgment in plaintiff's favor, notwithstanding jury's express finding that defendant was not entitled to municipal immunity for its employee's negligence resulting in plaintiff's personal injury); *Daley* v. *Kashmanian*, 193 Conn. App. 171, 173, 177, 219 A.3d 499 (2019) (upholding trial court's granting of employee's and municipality's motions to set aside $312,160.50 jury verdict on personal injury claim predicated on negligence), petition for cert. filed (Conn. October 23, 2019) (No. SC 190245), and cross petition for cert. filed (Conn. November 1, 2019) (No. SC 190256).

[12] I refer to the fact that a substantial number of our recent immunity cases, sometimes before the ink is dry, have themselves been overruled by still more recent cases. See, e.g., *Ventura* v. *East Haven*, 330 Conn. 613, 634–37 and n.12, 199 A.3d 1 (2019) (holding that immunity issues ordinarily present issue of law and overruling *Strycharz* v. *Cady*, 323 Conn. 548, 148 A.3d 1011 (2016), *Coley* v. *Hartford*, 312 Conn. 150, 95 A.3d 480 (2014), *Bonington* v. *Westport*, 297 Conn. 297, 999 A.2d 700 (2010), *Martel* v. *Metropolitan District Commission*, 275 Conn. 38, 881 A.2d 194 (2005), and *Lombard* v. *Edward J. Peters, Jr., P.C.*, 252 Conn. 623, 749 A.2d 630 (2000)); *Haynes* v. *Middletown*, 314 Conn. 303, 323–25 n.16, 101 A.3d 249 (2014) (overruling less demanding imminent harm standard used in *Purzycki* v. *Fairfield*, 244 Conn. 101, 708 A.2d 937 (1998), and *Burns* v. *Board of Education*, 228 Conn. 640, 638 A.2d 1 (1994)); *Grady* v. *Somers*, 294 Conn. 324, 348–49, 984 A.2d 684 (2009) (overruling "dicta" in *Pane* v. *Danbury*, 267 Conn. 669, 841 A.2d 684 (2004), and *Sanzone* v. *Board of Police Commissioners*, 219 Conn. 179, 191–92, 592 A.2d 912 (1991), that identifiable person, imminent harm exception does not apply to negligence claims brought against municipality only).

[13] In light of the theme of this opinion, it seems fitting that the municipal immunity doctrine itself originated from the careless transplantation to the New England states of an English case, *Russell* v. *Men of Devon*, 100 Eng. Rep. 359 (K.B. 1788). See E. Borchard, "Government Liability in Tort," 34 Yale L.J. 1, 41–42 (1924) (describing doctrine's history and explaining why *Russell*, which addressed liability of unincorporated and unfunded county, does not support granting immunity to municipalities). Numerous scholarly and judicial commentators have made the same observation as Professor Borchard regarding this unfortunate transplantation. See, e.g., *Muskopf* v. *Corning Hospital District*, 55 Cal. 2d 211, 216, 359 P.2d 457, 11 Cal. Rptr. 89 (1961) (Traynor, J.) (opining that cases that adopted reasoning of *Russell* "[ignored the] differences" that made *Russell* inapposite to municipalities in United States); *Spanel* v. *Mounds View School District No. 621*, 264 Minn. 279, 282, 118 N.W.2d 795 (1962) ("Every reason assigned by the court [in *Russell*] is born of expediency. The wrong to [the] plaintiff is submerged in the convenience of the public. No moral, ethical, or rational reason for the decision is advanced by the court except the practical problem of assessing damages against individual defendants."); E. Fuller & A. Casner, "Municipal Tort Liability in Operation," 54 Harv. L. Rev. 437, 438 n.2 (1941) ("[t]hese reasons [used in *Russell* to justify county immunity] were never applicable in America").

[14] In *Sanzone* v. *Board of Police Commissioners*, 219 Conn. 179, 592 A.2d 912 (1991), this court rejected a plaintiff's claim that her constitutional right to a remedy was violated when the trial court found that § 52-557n immunized municipal defendants from liability for injuries the plaintiff sustained as a result of an automobile collision allegedly caused by the defendants' negligent maintenance of a defective traffic signal. Id., 182–84, 194–95. It did so, however, on the ground that the legislature has made available an alternative form of liability as a substitute for any preexisting liabilities that may have existed prior to 1818. See id., 196–97 ("[t]he availability of redress under [General Statutes] § 13a-149 permits the legislature constitutionally to eliminate [common-law] remedies, if any, that may have existed prior to 1818 and that continued to exist prior to the Tort Reform Act of 1986, for injuries arising out of highway defects" (footnotes omitted)).

[15] This abuse of discretion standard is familiar in our jurisprudence. Cf. *State* v. *Ayala*, 324 Conn. 571, 588–89, 153 A.3d 588 (2017) ("[i]ndeed, the failure to exercise discretion is an abuse in and of itself"); *Sturman* v. *Socha*, 191 Conn. 1, 7, 463 A.2d 527 (1983) ("[D]iscretion imports something more than leeway in [decision making]. . . . Judicial discretion . . . is always legal discretion, exercised according to the recognized principles of equity. . . . While its exercise will not ordinarily be interfered with on appeal to this court, reversal is required where the abuse is manifest or where injustice

appears to have been done. . . . In essence, the trial judge's discretion should be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice." (Citations omitted; internal quotation marks omitted.)).

[16] "[O]ur courts consistently have held that to demonstrate the existence of a ministerial duty on the part of a municipality and its agents, a plaintiff ordinarily must point to some statute, city charter provision, ordinance, regulation, rule, policy, or other directive that, by its clear language, compels a municipal employee to act in a prescribed manner, without the exercise of judgment or discretion. See *Violano* v. *Fernandez*, 280 Conn. 310, 323, 907 A.2d 1188 (2006); *Evon* v. *Andrews*, 211 Conn. 501, 506–507, 559 A.2d 1131 (1989); *DiMiceli* v. *Cheshire*, [162 Conn. App. 216, 224–25, 131 A.3d 771 (2016)]; *Grignano* v. *Milford*, 106 Conn. App. 648, 659–60, 943 A.2d 507 (2008)." (Internal quotation marks omitted.) *Ventura* v. *East Haven*, 330 Conn. 613, 631, 199 A.3d 1 (2019).

[17] I do not suggest that the "clear abuse of discretion" rule articulated in *Wadsworth* was itself consistently followed by this court between 1920 and 1986. Our cases did not establish anything like the near-absolute immunity rule fashioned by this court after 1986, but they often followed a less nuanced approach than the court did in *Wadsworth*. See, e.g., *Fraser* v. *Henninger*, 173 Conn. 52, 60, 376 A.2d 406 (1977) (in describing distinction between ministerial and discretionary duties, noting that "[t]he word 'ministerial' 'refers to a duty which is to be performed in a prescribed manner without the exercise of judgment or discretion' "); *Pluhowsky* v. *New Haven*, 151 Conn. 337, 347, 197 A.2d 645 (1964) (same). Still, *Wadsworth*, more than any other case, was cited continually by this court in the common-law era as the leading precedent on "official immunity" in Connecticut, and, as of 1986, it remained unquestioned authority for the proposition that a municipal employee does not enjoy immunity from negligence liability if he fails to exercise the discretion required of him. Although there is one isolated case suggesting that *Wadsworth* does not establish any limitation on employee immunity for negligent (as opposed to wilful or wanton) conduct; see *Stiebitz* v. *Mahoney*, 144 Conn. 443, 449, 134 A.2d 71 (1957); the assertion is demonstrably incorrect. *Stiebitz* overlooks the fact that *Wadsworth* was a *negligence* case, and *Wadsworth* held that employee immunity for *negligence* is lost if the official acts are undertaken "wantonly or maliciously, *or with a clear abuse of discretion.*" (Emphasis added.) *Wadsworth* v. *Middletown*, supra, 94 Conn. 440.

[18] I do not agree with the majority's suggestion that the pursuit did not begin until the pursued vehicle began driving recklessly. A jury reasonably could conclude that the plaintiff's decedent was a passenger in a vehicle that was being operated in a safe manner until after the police vehicle observed its underglow lights, performed a U-turn, and pursued the vehicle for the apparent purpose of taking action against the driver. When a vehicle takes flight in response to the initiation of law enforcement activity of this nature, the recklessness inherent in the effort to evade the police cannot itself be used to justify the emergency pursuit. Otherwise, virtually all emergency pursuits would be justified, by definition, because a pursuit occurs only if the driver takes flight. I also strongly disagree with the majority's suggestion that the legal issue on appeal involves only the decision to initiate the pursuit, not to continue the pursuit after its initiation. To the contrary, the underlying lawsuit and the present appeal plainly include the entire pursuit from start to finish. See part II A of this opinion.

[19] See *Colon* v. *Board of Education*, 60 Conn. App. 178, 183, 758 A.2d 900 ("[T]here was no directive describing the manner in which [a teacher or an employee] was to open doors. Rather, it appears that it is [the teacher's or employee's] poor exercise of judgment when opening the door that forms the basis of the plaintiffs' complaint. Accordingly, we conclude that [the teacher's or employee's] actions were discretionary in nature."), cert. denied, 255 Conn. 908, 763 A.2d 1034 (2000), and cert. denied, 255 Conn. 908, 763 A.2d 1034 (2000). I wish I were exaggerating here, but I am unable to overstate the scope of the current doctrine; even a maintenance worker who fails to shovel snow from a sidewalk is immune from negligence liability under our current doctrine. See *Kusy* v. *Norwich*, 192 Conn. App. 171, 180, 217 A.3d 31 ("[t]he act of snow and ice removal, absent a directive strictly imposing the time and manner in which it is to be done, is inherently a discretionary act"), cert. denied, 333 Conn. 931, 218 A.3d 71 (2019).

[20] To the contrary, the public policy established by our current doctrine is inimical to public safety. The doctrine encourages municipal managers to avoid promulgating any rule, directive or policy that could be used in a

lawsuit to defeat an immunity defense. For anyone in municipal government paying the least bit of attention to our cases, "there shall be no mandatory policies regarding operations" will become the only mandatory policy regarding operations. Just as the general counsel to a private enterprise will instruct management never to publish a personnel manual that could be construed as creating contractual rights in an employee; see *Gaudio* v. *Griffin Health Services Corp.*, 249 Conn. 523, 535, 733 A.2d 197 (1999) ("[w]e have stated with unambiguous clarity that employers can protect themselves against employee contract claims based on statements made in personnel manuals by following either (or both) of two simple procedures: (1) eschewing language that could reasonably be construed as a basis for a contractual promise; and/or (2) including appropriate disclaimers of the intention to contract" (internal quotation marks omitted)); so, too, budget-conscious municipal managers will instruct supervisory employees never to characterize any operational duties or tasks as mandatory and never to prescribe in mandatory terms how any such task must be executed. This "no ministerial policy" policy not only will make the workplace less safe, for both municipal employees and members of the public, but it will have the desired effect of reducing the line item for legal liability in the annual budget.

[21] See General Statutes (Supp. 1945) § 89h (saving harmless municipal police officers for negligence in operating vehicle, amended in 1955; General Statutes (Supp. 1955) § 265d; to indemnify municipal police officers for all liability for damage to persons or property, and repealed in 1957 by Public Acts 1957, No. 401, § 3, with establishment of broader § 7-465 indemnification); General Statutes § 10-235 (enacted in 1949 to "protect and save harmless" any member of board of education, teacher, or other board employee from financial loss and expense arising out of accidental injury to persons or property); General Statutes § 7-465 (enacted in 1957 to indemnify municipal employees for liability for damages to persons or property); General Statutes § 7-308 (enacted in 1955 to "protect and save harmless" municipal volunteer firefighters, ambulance members, and fire police officers from financial loss and expense arising out of any negligence claim); General Statutes § 7-101a (enacted in 1971 to "protect and save harmless" municipal officers from financial loss and expense, including legal fees and costs, arising out of any negligence claim).

[22] Number 251 of the 1945 Public Acts provides in relevant part: "Each municipality of this state, notwithstanding any inconsistent provision of law, general, special or local, or the limitation contained in the provisions of any city or town charter, shall, upon adopting the provisions of this act in the manner hereinafter provided, save harmless any duly appointed policeman of such municipality for the negligence of such appointee in the operation of a vehicle upon the public streets or highways in the discharge of a duty imposed by law upon such appointee or municipality, provided the appointee, at the time of the accident, injury or damages complained of, was acting in the performance of his duties and within the scope of his employment. . . ."

[23] In the absence of express statutory authority, it evidently was uncertain at the time whether municipalities lawfully could expend public funds to insure or indemnify municipal employees for negligence liability. See Conn. Joint Standing Committee Hearings, Judiciary, 1945 Sess., p. 201, remarks of Representative Edward H. Delafield.

[24] Number 469 of the 1953 Public Acts provides in relevant part: "Each municipality of this state, notwithstanding any inconsistent provision of law, general, special or local, or the limitation contained in the provisions of any city or town charter, shall, upon adopting the provisions of this section in the manner hereinafter provided, pay on behalf of any duly appointed policeman of such municipality all sums which such appointee shall become obligated to pay by reason of the liability imposed upon such appointee by law for damages to person or property, provided the appointee, at the time of the occurrence, accident, injury or damages complained of, was acting in the performance of his duties and within the scope of his employment, in the discharge of a duty imposed by law upon such appointee or municipality and provided such occurrence, accident, injury or damage was not the result of any wilful or wanton act of such employee in the discharge of such duty. . . ."

[25] See 7 S. Proc., Pt. 6, 1957 Sess., pp. 3228–29 (clerk reading Governor Abraham Ribicoff's veto message regarding P.A. 57-401); id., pp. 3230–32, remarks of Senator Benjamin L. Barringer (describing thorough discussion before Judiciary Committee and extensive study by Legislative Council regarding bill's merits).

[26] The controversy inspired strong feelings and harsh words. See, e.g., 7 S. Proc., supra, p. 3232, remarks of Senator Benjamin L. Barringer (accusing governor of "trying to usurp the legislative functions" and trying "to pervert the legislative functions into the executive functions"); id., pp. 3235–37, remarks of Senator Healey (responding in kind in support of governor); see also 7 H.R. Proc., supra, p. 2224, remarks of Representative Erving Pruyn ("I'm very sorry to learn that the [g]overnor will probably veto this bill if it reaches him, because in doing so he will be thwarting the will of the legislature, the duly elected representatives of the people of the state for the second time, and such thwarting is done after careful research and investigation and recommendation by the Legislative Council. I think it's against the public [interest] for him to veto this bill, and I hope that he will see the light.").

[27] See also 7 S. Proc., supra, p. 3233, remarks of Senator Harold Borden ("Why should a poor individual who makes [f]ifty or [s]ixty [d]ollars a week, just because he happens to be employed by a municipality, [which] can very well afford it, and if they can't afford it, then if there is a [t]en [t]housand [d]ollar judgment against this individual then it's split up amongst five, ten and twenty or thirty thousand [municipal taxpayers] instead of one individual. Why should he be different than a man working in private industry? I say, he should not be different than private industry. This is a very good bill. I was on the [l]egislative [c]ouncil and this bill was heard. It came before the [l]egislative [c]ouncil. We discussed this bill. We had pros and cons. It finally reached an impasse where we approved this bill unanimously and had the bill drawn et cetera and sent it to the legislature. I am going to vote to override the veto."); id., p. 3230, remarks of Senator Benjamin L. Barringer ("We feel, and we felt in the [Judiciary] Committee, that this was a reasonable and proper bill. We felt that a municipal corporation should be as subject to [a lawsuit for the negligence of its employees] as a private corporation.").

[28] See also 7 H.R. Proc., supra, p. 2220, remarks of Representative Louis J. Padula ("As . . . you know there's a statute where the towns are liable for negligent acts of firemen, and recently the bill was increased to cover policemen, where the town has the right to assume they are liable when in the performance of their duties. There are other employees of the town that outnumber the firemen and policemen that are exposed to the same type of risk." (Internal quotation marks omitted.)); id., p. 2224, remarks of Representative Erving Pruyn ("[at the] hearing before the [L]egislative [C]ouncil representatives of the city of Hartford appeared and stated that they insured all their municipal employees who drive automobiles or rather protected them—they do it on a self-insurance basis; that their policemen and firemen and school teachers were protected, but a similar protection was not given to the other municipalities; and they pointed out that the employees of the Public Works Department and the Park[s] Department are not protected, although many of them come in contact with members of the general public in carrying out their duties; and they further stated that the distinction between these employees of the city was harmful to the morale of the employees who are not protected").

[29] See also 7 H.R. Proc., supra, p. 2216, remarks of Representative Pruyn ("[i]t is only fair and just that losses from injuries and damages of the kind under discussion, should be spread over society in general instead of being borne by the innocent victim"); id., pp. 2222–23, remarks of Representative A. Searle Pinney ("[T]he basic underlying question . . . is simply this: Should an injured individual bear the cost of an accident, which wasn't his fault, or should it be borne by the agency which caused it and the burden spread over the public at large[?] I find nothing in [the governor's veto] message which attempts to handle that question. The [L]egislative [C]ouncil in its study of the matter went into that in great detail, and came to the conclusion that the cost should be borne by the agency doing the harm and it should be spread over the entire public. The public can protect itself through insurance or through one of the self-insuring systems that some of the towns in this state have already adopted."); id., p. 2225, remarks of Representative Pruyn (After describing the facts of a case in which the municipality was found by this court to be immune from liability, stating: "Now, here you have . . . a girl badly injured, no remedy except the doubtful one of recovering against the municipal employee. Certainly the spreading of this loss over the general society [by way of the indemnification statute] is certainly much better than of allowing the poor innocent victim to bear the loss."); 7 H.R. Proc., Pt. 5, 1957 Sess., p. 2763, remarks of Representative Pruyn ("it's only fair and just that losses from injuries and damages of this

kind should be spread over society instead of being borne by the person who is injured by the act of a municipal employee—the innocent victim").

[30] See 7 S. Proc., supra, p. 3231, remarks of Senator Barringer ("[w]e're always in the habit of further studying matters if they're too hot to consider, and it was referred to the [l]egislative [c]ouncil and I'm given to understand that the [l]egislative [c]ouncil again endorsed the merits of the bill unanimously and returned it to this [G]eneral [A]ssembly as a bill worthy of our consideration"); 7 H.R. Proc., Pt. 4, 1957 Sess., pp. 2215–16, remarks of Representative Pruyn ("Because of the importance of this type of legislation the 1955 session referred this bill to the [l]egislative [c]ouncil for study and recommendation. Now, the [c]ouncil gave an exhaustive study to this proposition; it held a public hearing at which representatives from several municipalities appeared and urged favorable action on this bill. The [c]ouncil after studying what other states have done, very careful consideration, came to the conclusion that the old doctrine of governmental immunity based as it is on that ancient principle that the [k]ing can do no wrong, was outmoded, and that with the great increase of activities now being carried on by the municipalities and the availability at reasonable cost of insurance protection, the municipalities should assume the liability for injuries caused by their employees acting in the performance of their duties, and within the scope of their employment. This bill . . . was therefore recommended for passage by the [l]egislative [c]ouncil.").

[31] The Report of the Legislative Council also identified the three main arguments against indemnification: "1. Citizens would become claim-conscious and the number of legal suits would rise tremendously. 2. High awards would be made because of the feeling that the government would be paying, when actually the taxpayers would be footing the bill. 3. Municipal employees would become careless in their duties to the detriment of the community, in the knowledge that the municipality is legally responsible for their acts." Report of the Legislative Council (December 7, 1956) p. 13.

[32] Judge Shea notes that Judge (later Justice) John P. Cotter reached the opposite conclusion in *Boucher* v. *Fuhlbruck*, 26 Conn. Supp. 79, 83, 213 A.2d 455 (1965). See *Lapierre* v. *Bristol*, 31 Conn. Supp. 442, 445–46, 333 A.2d 710 (1974). *Boucher* relies on generic canons of statutory construction and does not examine the extensive legislative history considered by Judge Shea. I include Judge Shea's views because they reflect a contemporaneous analysis of the proper construction of § 7-465 as events were unfolding. It is important to understand, however, that the conclusions contained in this opinion do not depend at all on Judge Shea having been right about the intended effect of § 7-465 on the discretionary/ministerial distinction as it applies to municipal employees. Whatever the intended status of the distinction as a general matter after the enactment of § 7-465, the historical record makes it abundantly clear that the distinction had no application to the employee's liability for negligent driving (routine or emergency) under the common law. See part II of this opinion. Liability unquestionably existed as a matter of well settled common law. Because § 7-465 was an indemnification statute, the doctrine likewise had no application to the municipality's indemnity obligations with respect to municipal employee liability in such cases.

[33] "Section 7-101a, as initially adopted in 1971, mandated that municipalities 'protect and save harmless any member of any board, committee or commission of such municipality from financial loss and expense, including legal fees and costs, if any, arising out of any claim, demand, suit or judgment by reason of alleged negligence on the part of such member while acting in the discharge of his duties as such member.' Public Acts 1971, No. 726. In 1975, this statute was extended to local council members and included protection 'for alleged infringement of any person's civil rights.' Public Acts 1975, No. 75-408. In 1977, the statute was amended further by extending coverage to include 'any full-time municipal employee.' Public Acts 1977, No. 77-399. This amendment became effective October 1, 1977." *Ahern* v. *New Haven*, 190 Conn. 77, 79–80, 459 A.2d 118 (1983). The statute was amended again in 1980; Public Acts 1980, No. 80-403, §§ 9 and 10; and in 1989. Public Acts 1989, No. 89-212, § 11; Public Acts 1989, No. 89-378.

[34] I say that the continued vitality of the discretionary function doctrine was uncertain in the wake of § 7-465 because there was a difference of opinion on the question. On the one hand, there is rather compelling evidence in the legislative history supporting the conclusion reached by Judge Shea, who determined that the legislature intended to eradicate the doctrine altogether with the enactment of § 7-465: "A review of the [R]eport of the [L]egislative [C]ouncil and a study of the wording of the bill convince this court that it was the intention of the legislature to subject municipal employ-

ees, and hence municipalities by way of indemnification, to liability for discretionary as well as ministerial acts so long as they were performed within the scope of the employment." *Lapierre* v. *Bristol*, supra, 31 Conn. Supp. 446. On the other hand, this court evidently had no occasion between 1957 and 1986 to consider the question decided by Judge Shea, and we continued to apply the discretionary function doctrine (although not in its current extreme version). See footnote 18 of this opinion.

[35] Historically, there has never been any doubt that police officers (and firefighters) are personally liable for damages caused by negligent, on-duty driving. See part II of this opinion. Indeed, protecting police and fire workers against personal liability was why our legislature enacted the original municipal indemnification statutes in Connecticut. See part I C of this opinion (discussing legislative history of No. 251 of the 1945 Public Acts).

[36] To be clear, the common law also never conferred immunity on the employee for vehicular negligence, whether under routine or emergency conditions. See part II of this opinion. My immediate point, however, is simply that the individual defendants are not entitled to immunity under the plain language of § 52-557n (a).

[37] See 29 H.R. Proc., Pt. 16, 1986 Sess., p. 5939, remarks of Representative Robert G. Jaekle ("[Subs]ection (a), both the liability and the exemptions from liability are unless otherwise provided by law. Federal, state or local."). There are two responses to any criticism that this reading of § 52-557n would nullify its limitations on municipal liability because a plaintiff could recover indirectly, via indemnification pursuant to § 7-465, what the plaintiff is prohibited by the municipal entity immunity doctrine from recovering directly from the municipality. First, far from being irrational or absurd, this arrangement replicates precisely the result under Connecticut law before the enactment of § 52-557n. The municipality itself was immune, but it was obligated by statute to indemnify the employee for any personal liability resulting from that employee's negligence. This is why it is said that § 52-557n codified the then-existing common law. Second, in the same way that § 7-465 cannot be allowed to swallow up § 52-557n, we also must ensure that § 52-557n is not construed to effectively swallow up § 7-465, a statute of great importance. See part I C of this opinion. Nothing in § 52-557n or its legislative history suggests any legislative intention to repeal § 7-465 or render it nugatory. See, e.g., *Rivera* v. *Commissioner of Correction*, 254 Conn. 214, 242, 756 A.2d 1264 (2000) ("[I]t is a well established rule of statutory construction that repeal of the provisions of a statute by implication is not favored and will not be presumed where the old and the new statutes . . . can peacefully coexist. . . . If, by any fair interpretation, we can find a reasonable field of operation for both [statutes], without destroying or perverting their meaning and intent, it is our duty to reconcile them and give them concurrent effect." (Internal quotation marks omitted.)).

[38] See also *State* v. *Josephs*, 328 Conn. 21, 27, 176 A.3d 542 (2018) (in construing statutes, "[w]e are not permitted to supply statutory language that the legislature may have chosen to omit" (internal quotation marks omitted)); *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, 316 Conn. 790, 803–804, 114 A.3d 1181 (2015) ("[i]t is not the province of this court, under the guise of statutory interpretation, to legislate . . . a [particular] policy, even if we were to agree . . . that it is a better policy than the one endorsed by the legislature as reflected in its statutory language"); *State* v. *Rupar*, 293 Conn. 489, 511, 978 A.2d 502 (2009) ("We are not in the business of writing statutes; that is the province of the legislature. Our role is to interpret statutes as they are written. . . . [We] cannot, by [judicial] construction, read into statutes provisions [that] are not clearly stated." (Internal quotation marks omitted.)); *Glastonbury Co.* v. *Gillies*, 209 Conn. 175, 181, 550 A.2d 8 (1988) ("As we have stated in numerous other cases, 'it is not the province of a court to supply what the legislature chose to omit. The legislature is supreme in the area of legislation, and courts must apply statutory enactments according to their plain terms.' ").

[39] It is indisputable that the municipal employee was personally liable for negligent, on-duty driving under our common law. It also is indisputable that the municipality, although itself immune from liability under the common law, was required by statute to indemnify this liability. See part II of this opinion.

[40] To avoid any misunderstanding, I am not suggesting that § 52-557n imposes municipal liability in all circumstances not specifically carved out by § 52-557n (b). Not at all. Just as subsection (a) contains the basic rules of municipal liability, it also contains the basic rules of municipal immunity, not the least of which is § 52-557n (a) (2) (B), which codifies the doctrine

of discretionary act immunity. The point here is that, when, as in the present case, then existing law did not confer immunity for negligent driving of police vehicles (or any other municipal vehicles), then any change or clarification intended by the legislature in 1986 necessarily would be found in § 52-557n (b). There is nothing in section (b) granting immunity in this case.

[41] See, e.g., *State* v. *Salamon*, supra, 287 Conn. 525–26 ("[i]t is significant . . . that, with the exception of a 1993 amendment to [General Statutes] § 53a-94 affecting only its penalty provisions, neither that section nor the pertinent definitional section, General Statutes § 53a-91, has been subject to any substantive amendments since it first was enacted in 1969" (footnote omitted)). Section 52-557n, likewise, has been amended only twice since its enactment, and neither amendment involved subsection (a) or involved any issue relevant to this case. See Public Acts 1992, No. 92-198 (adding subsection (c) concerning immunity of members of local boards and commissions who are not compensated for their membership); Public Acts 1993, No. 93-290 (adding subdivision (10), regarding preexisting conditions on land sold or transferred by the state, to subsection (b)).

[42] I am aware of a single exception to this proposition, which is the immunity provided to the state and its political subdivisions by General Statutes § 28-13 (a) for actions taken in connection with a civil preparedness emergency declared by the governor pursuant to General Statutes § 28-9. See *Sena* v. *American Medical Response of Connecticut, Inc.*, 333 Conn. 30, 32–33, 213 A.3d 1110 (2019).

[43] *Bottomley* v. *Bannister*, 12 K.B. 458, 476 (1932) ("It is a commonplace of the law of negligence that before you can establish liability for negligence you must first show that the law recognizes some duty towards the person who puts forward the claim. . . . English law does not recognize duty in the air, so to speak; that is, a duty to undertake that no one shall suffer from one's carelessness."); see also *Shore* v. *Stonington*, 187 Conn. 147, 151, 444 A.2d 1379 (1982) ("[t]he law does not recognize a 'duty in the air' ").

[44] I defer discussion of the alternative reading of § 14-283 proposed in the Chief Justice's concurring opinion until the end of part II B of this opinion.

[45] The plaintiff's complaint alleges that the pursuing officers were negligent *both* in initiating the pursuit and in the manner in which they conducted the pursuit, and the summary judgment proceedings addressed those allegations. The trial court's memorandum of decision granting the defendants' motion for summary judgment likewise decided those issues. On appeal, the plaintiff identifies the issue presented broadly: "Did the trial court err when it concluded that . . . § 14-283 imposed a discretionary, as opposed to ministerial, duty?" The defendants' appellate brief follows suit and presented the following counterstatement of the issue: "Whether the trial court correctly determined, based upon the allegations of the plaintiff's complaint, that the acts and omissions complained of with respect to Renaldi and Jasmin inherently involve discretionary acts/duties?"

[46] In part B 1 of her brief, the plaintiff seeks (unsuccessfully) to harmonize a host of conflicting Superior Court decisions on the subject by focusing on the officer's decision making when initiating a vehicular pursuit. Part B 2 of the plaintiff's brief, however, argues in the alternative by asserting (correctly, in my view) that immunity does not apply for the simple reason that §14-283 requires that even police officers operating emergency vehicles must exercise due care at all times, period. See *Borelli* v. *Renaldi*, Conn. Supreme Court Briefs and Appendices, April Term, 2019, Plaintiff's Brief pp. 14–15 ("[W]hereas typically governmental immunity is applied to those activities that are uniquely government functions, the operation of a motor vehicle on a public roadway is not unique to the government. Rather, ordinary citizens . . . use the public roadways on a daily basis. Accordingly, those courts that have found that § 14-283 imposes a ministerial duty have done so on the conclusion that it is desirable, from a public policy perspective, to mandate that officers act reasonably on the road. Any other conclusion creates the risk of chaotic and unpredictable roadways."). I need not and do not address the artificial and academic question whether immunity would attach to the isolated decision to initiate a high speed chase alone, without more, because that question is not presented here (nor do I suspect that it will ever be raised as a complete and stand-alone theory of liability).

[47] See, e.g., *Borelli* v. *Renaldi*, Conn. Supreme Court Briefs and Appendices, April Term, 2019, Plaintiff's Brief p. 2 ("[T]he correct conclusion [in the trial court] should have been that a ministerial duty existed under [the] plain language of § 14-283 (d), and that it was for the jury to decide the factual question of whether the defendants performed that duty at all—that is to say, whether the officers did give due regard for the safety of those

involved in the chase in light of the seriousness of the offense. Given that the defendants engaged in an extremely dangerous chase at night over a minor infraction, a jury could conclude that the officers engaged in the chase thoughtlessly and did not give due regard to safety balanced against the nature of the minor offense conduct, as § 14-283 requires."); id., p. 5 ("Renaldi did not cease his pursuit but instead attempted to proceed to halt the minor infraction he had observed by continuing, even though he was losing ground on the Mustang throughout the chase" (footnote omitted)); id., pp. 14–15 (emphasizing that, in addition to the express directive contained in § 14-283, the requirements found in both § 14-283a-4 (b) (4) of the Regulations of Connecticut State Agencies and § 5.11.12.B of the Seymour Police Department Pursuit Policy impose mandatory duties for *driving* emergency vehicles extending beyond the threshold decision to initiate a pursuit); see also id., p. 15 (arguing that various pursuit policies demonstrate that safe operation of vehicle during police pursuit is ministerial duty because "[a] reasonable interpretation of these state and local [pursuit] policies is that the state and local agencies understood that the operation of an emergency vehicle, even one in the pursuit of a suspect, must be done with safety, because § 14-283 requires as much" (emphasis omitted); id., p. 17 (arguing that this court's other discretionary duty cases do not apply to police pursuits because there is statutorily recognized duty to drive safely during pursuit, specifically, "[§] 14-283 represents a legislative determination as to what should happen in a police pursuit").

[48] In support of its contention that the plaintiff's appeal involves solely the officer's decision to initiate the pursuit and excludes his conduct in the continuation of the pursuit, the majority observes that the Uniform Statewide Pursuit Policy likewise treats the two aspects of a pursuit separately, addressing initiation under § 14-283a-4 (a) of the Regulations of Connecticut State Agencies, and the continuation of the pursuit under § 14-283a-4 (b) and (d). One flaw in this argument, among others, is that a different subsection of the same Uniform Statewide Pursuit Policy collapses the clean line drawn by the majority by requiring the pursuing officer, throughout the entire duration of the pursuit, to "continually re-evaluate and assess the pursuit situation, including all of the initiating factors, and terminate the pursuit whenever he or she reasonably believes that the risks associated with continued pursuit are greater than the public safety benefit of making an immediate apprehension." Regs., Conn. State Agencies § 14-283a-4 (e) (1). The bottom line is that the typical negligence claim arising from a police pursuit almost always will require factual consideration of the initiation, continuation *and* termination of the pursuit, and it serves no useful purpose to draw bright-line distinctions between those intertwined aspects of the pursuit when applying the immunity doctrine or the requirements of § 14-283, for the simple reason that the legal analysis will always turn on the same fundamental underlying claim, which is that, *at each and every stage of the pursuit,* the officer is required by positive law to exercise the same standard of due care applicable to all drivers on our public roads.

[49] See, e.g., *Shore* v. *Stonington*, 187 Conn. 147, 157, 444 A.2d 1379 (1982) (police officer owes no duty to remove from road all persons who may pose potential hazard).

[50] On a few occasions, this "self-evident" proposition has been challenged by defendants in our Superior Court, almost always without success. See, e.g., *Williams* v. *New London*, Superior Court, judicial district of New London, Docket No. CV-12-6012328-S (April 7, 2014) (58 Conn. L. Rptr. 86, 89–90) (noting "sizeable majority" of Superior Court cases "that have held that routine nonemergency driving involves ministerial, rather than discretionary, duties"); *Pelletier* v. *Petruck*, Superior Court, judicial district of Hartford, Docket No. CV-07-5009064-S (September 10, 2008) (46 Conn. L. Rptr. 288, 289) ("Connecticut [case law] supports the argument that the operation of a motor vehicle is, in fact, a ministerial act to which government immunity does not attach"); *MacMillen* v. *Branford*, Superior Court, judicial district of New Haven, Docket No. 374004 (March 30, 1998) (21 Conn. L. Rptr. 561, 561) ("the operation of a motor vehicle is a ministerial act that does not confer governmental immunity"); *Hurdle* v. *Waterbury*, Docket No. 0123428, 1995 WL 781380, *2 (Conn. Super. December 12, 1995) ("the [police officer] having embarked upon . . . a plan of action, which involved the operation of a motor vehicle on the public highways . . . is duty bound to physically operate the vehicle in a reasonable manner"); *Borchetta* v. *Brown*, 41 Conn. Supp. 420, 424, 580 A.2d 1007 (1990) ("operation of a police vehicle was a ministerial function"); *Letowt* v. *Norwalk*, 41 Conn. Supp. 402, 406, 579 A.2d 601 (1989) (police officer's act of driving to scene of accident was

ministerial). But see *Gordils* v. *Hartford*, Docket No. CV-07-5012160-S, 2009 WL 1444793, *2 (Conn. Super. May 5, 2009) (sanitation worker who drove truck into trash barrel that allegedly then struck plaintiff was engaged in discretionary act, and he "made an error in judgment by driving too close to the sidewalk").

[51] The Appellate Court came close to addressing the issue in a recent decision. See *Daley* v. *Kashmanian*, 193 Conn. App. 171, 219 A.3d 499 (2019), petition for cert. filed (Conn. October 23, 2019 (No. SC 190245), and cross petition for cert. filed (Conn. November 1, 2019) (No. SC 190256). In *Daley*, the vehicle driven by the defendant police officer had collided with the plaintiff's motorcycle when the officer was conducting "surveillance" of the plaintiff. Id., 174. In affirming the Superior Court's order granting the defendants' motion for a directed verdict on the plaintiff's negligence claim, the Appellate Court focused its analysis on whether surveillance of a suspect is discretionary or ministerial. See id., 184 (noting that "[n]either [the] Supreme Court nor [the Appellate] [C]ourt has determined whether a municipal police officer conducting surveillance while driving a motor vehicle is engaged in discretionary or ministerial conduct"). The court did not decide whether the act of driving, in itself, is discretionary or ministerial or address the impact that § 14-283 would have on the analysis.

[52] See, e.g., *Sena* v. *American Medical Response of Connecticut, Inc.*, 333 Conn. 30, 52, 213 A.3d 1110 (2019) (concluding that General Statutes § 28-13 (a) extends sovereign immunity to state's political subdivisions for actions taken in connection with civil preparedness emergency).

[53] *Prescott* v. *Meriden*, 273 Conn. 759, 762–63, 873 A.2d 175 (2005) (treating as "discretionary" school employee's failure to keep bleachers safe by removing rain water that had caused slipping hazard); *Kusy* v. *Norwich*, 192 Conn. App. 171, 178, 217 A.3d 31 (treating as "discretionary" school employee's failure to remove snow and ice from walkway in absence of mandatory policy directive prescribing manner in which snow and ice are to be removed), cert. denied, 333 Conn. 931, 218 A.3d 71 (2019).

[54] This may explain why our automakers are experiencing such difficulty perfecting a self-driving car; bad human judgment causes accidents, but the right kind of human judgment seems essential to good driving. See N. Oliver et al., "To Make Self-Driving Cars Safe, We Also Need Better Roads and Infrastructure," Harv. Bus. Rev., August 14, 2018, available at http://hbr.org/2018/08/to-make-self-driving-cars-safe-we-also-need-better-roads-and-infrastructure (last visited June 22, 2020) (explaining difficulty in designing autonomous vehicles that can safely navigate "edge cases" like "accidents, road work, or a fast-approaching emergency response vehicle"); National Transportation Safety Board, Department of Highway Safety, Vehicle Automation Report No. HWY18MH010 (November, 2019) (report on death of Elaine Herzberg, pedestrian struck and killed by self-driving car in Tempe, Arizona, on March 18, 2018).

[55] See, e.g., General Statutes § 14-218a (a) ("[n]o person shall operate a motor vehicle . . . at a rate of speed greater than is reasonable, having regard to the width, traffic and use of highway, road or parking area, the intersection of streets and weather conditions"); General Statutes § 14-240 (a) ("[n]o person operating a motor vehicle shall follow another vehicle more closely than is reasonable and prudent, having regard for the speed of such vehicles, the traffic upon and the condition of the highway and weather conditions"); *McDonald* v. *Connecticut Co.*, 151 Conn. 14, 17, 193 A.2d 490 (1963) ("The plaintiff claims that the operator of the bus failed to maintain a proper lookout. An operator of a motor vehicle is chargeable with notice of dangers of whose existence he could become aware by a reasonable exercise of his faculties.").

[56] See *Edgerton* v. *Clinton*, 311 Conn. 217, 228 n.10, 86 A.3d 437 (2014) (immunity appropriately applied to situations involving "split second, discretionary decisions on the basis of limited information").

[57] The costs of the victim's injuries, of course, do not disappear; the costs merely get transferred to a payer other than the negligent employee or his municipal employer. The burden may be shifted to the victim him or herself, or to his or her medical insurer and/or employer, or to the various governmental programs of last resort that must pay the costs imposed on society when the responsible party is not held accountable. Meanwhile, the most efficient cost-avoiders and most effective cost-spreaders in connection with the harm—the municipal employee and the municipality—escape liability without paying a nickel.

[58] I use quotation marks here because it would appear to be inaccurate, on this record, to characterize the officer as "responding" to an emergency.

A jury easily might conclude that the officer actually *created* the emergency and, thus, created the danger resulting in the plaintiff's injuries, by initiating a high speed pursuit in response to a minor violation of the motor vehicle laws. I discuss this point at greater length later in this opinion.

[59] The word "duty," as used here, has a definitive legal meaning as a legally enforceable obligation. See Black's Law Dictionary (11th Ed. 2019) p. 637 ("duty" means, inter alia, "[a] legal obligation that is owed or due to another and that needs to be satisfied; that which one is bound to do, and for which somebody else has a corresponding right"). As this definition explains, the existence of a legal duty necessarily implies a corresponding legal right in one or more other persons to obtain redress for breach of that duty. Without that right of enforcement, no duty exists in the eyes of the law. See W. Hohfeld, "Some Fundamental Legal Conceptions as Applied in Judicial Reasoning," 23 Yale L.J. 16, 33 (1913) ("a duty is the invariable correlative of that legal relation which is most properly called a right or claim"). In § 14-283 (d), the legislature explicitly recognized the continued existence of a duty owed to other persons using the roadway. In this context, the existence of that legal duty necessarily implies a correlative right on the part of injured parties to sue for breach of that duty.

[60] This was not the first time the town had defended against a negligence action based on § 7-465 indemnification. See *Bailey* v. *Stratford*, 29 Conn. Supp. 73, 74, 271 A.2d 122 (1970) (same municipality sued for negligence of employee under § 7-465).

[61] If the defendants had overlooked a viable immunity defense, the court in *Tetro* likely would have found it prudent to note that fact, neutrally and in passing, so as to leave open for another day a holding based on that defense. Judge Povodator made a slightly different point regarding *Tetro* in a police pursuit case when he observed that the holding in *Tetro* would be "superfluous (if not self-contradictory) if there were no possibility of liability of a police officer whose conduct came within the scope of § 14-283." *Torres* v. *Norwalk*, Superior Court, judicial district of Stamford-Norwalk, Docket No. FST-CV-16-6029691-S (May 2, 2018) (66 Conn. L. Rptr. 548, 558).

[62] By my count, this is the third time that our more recent immunity cases have dealt in this fashion with precodification, common-law cases that were alive and well at the time the legislature enacted § 52-557n. See *Northrup* v. *Witkowski*, 332 Conn. 158, 166, 210 A.3d 29 (2019) (overruling *Spitzer* v. *Waterbury*, 113 Conn. 84, 154 A. 157 (1931)); *Grady* v. *Somers*, 294 Conn. 324, 353, 984 A.2d 684 (2009) (observing that *Sestito* v. *Groton*, supra, 178 Conn. 520, "appears . . . to be limited to its facts"); see also *Edgerton* v. *Clinton*, 311 Conn. 217, 240, 86 A.3d 437 (2014) (stating that "we . . . found [in *Grady*] that [*Sestito*'s] holding is limited to its facts"). Our holding that *Sestito* is "limited to its facts" is, of course, a gentle way to say it has been overruled, although I do not see the need to euphemize. In any event, our decision to bury *Sestito* is directly contrary to the intention of the legislature, which intended to codify its holding rather than overrule it. See Report of the Law Revision Commission to the Judiciary Committee Comparing Public Act 86-338, An Act Concerning Tort Reform, and Prior Connecticut Law (1987) p. 22 (citing *Sestito* as an example "of the underlying [common-law principle]" that a municipality is liable when "there is a knowing failure to act or to exercise a prescribed duty of care endangering individuals"). Likewise, any attempt by this court to marginalize the holding of *Tetro* would run contrary to the legislative intention evident from the chronology described in the text accompanying this footnote.

[63] See, e.g., Haw. Rev. Stat. § 291C-26 (d) (2007) ("[t]he foregoing provisions shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall those provisions protect the driver from the consequences of the driver's reckless disregard for the safety of others"); Kan. Stat. Ann. § 8-1506 (d) (2001) ("[t]he foregoing provisions shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of reckless disregard for the safety of others"); N.Y. Veh. & Traf. Law § 1104 (e) (McKinney 2011) ("[t]he foregoing provisions shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others"); Wn. Rev. Code Ann. § 46.61.035 (4) (West 2012) ("[t]he foregoing provisions shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of his

or her reckless disregard for the safety of others").

[64] Although, in 1971, Connecticut adopted almost all of the UVC as it then existed, without any substantive deviation, our legislature did *not* adopt the model version of subsection (d), which, at that time, provided that "[t]he foregoing provisions shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, *nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others*." (Emphasis added.) National Committee on Uniform Traffic Laws and Ordinances, Uniform Vehicle Code and Model Traffic Ordinance (1968 Rev.) § 11-106 (d), p. 135. Instead, in P.A. 71-538, the legislature chose to retain the traditional negligence standard of care: "The provisions of this act shall not relieve the operator of an emergency vehicle from the duty to drive with due regard for the safety of all persons and property." P.A. 71-538, codified as amended at General Statutes § 14-283 (d).

[65] Even among states that have adopted the UVC's "reckless disregard" language, most nonetheless adhere to a negligence standard of liability for emergency drivers on the basis of the statutory reference to the duty of due care. See, e.g., *Rutherford* v. *State*, 605 P.2d 16, 19–20 (Alaska 1979); *Pogoso* v. *Sarae*, 138 Haw. 518, 525, 382 P.3d 330 (App. 2016), cert. dismissed, Docket No. SCWC-12-0000402, 2017 WL 679187 (Haw. February 21, 2017); *Stenberg* v. *Neel*, 188 Mont. 333, 337–38, 613 P.2d 1007 (1980); *Wright* v. *Knoxville*, 898 S.W.2d 177, 179–80 (Tenn. 1995). The courts in a minority of jurisdictions have concluded that their respective statutes' "reckless disregard" standard supplants the negligence standard for liability purposes. See, e.g., *Robbins* v. *Wichita*, supra, 285 Kan. 469–70; *Seide* v. *State*, 875 A.2d 1259, 1268 (R.I. 2005); *Rochon* v. *State*, 177 Vt. 144, 145, 862 A.2d 801 (2004).

[66] The flaw in the majority opinion's analysis is well illustrated by its reliance on *Coley* v. *Hartford*, 312 Conn. 150, 95 A.3d 480 (2014), to establish that this court's interpretation of "similar statutory language" creates a discretionary, rather than a ministerial, duty to act. First, the statutory language at issue in *Coley* is not at all "similar" to that in § 14-283 (d). Unlike § 14-283, the statute in *Coley* (1) did not mention the word "duty" or use an iconic legal term of art imposing a "duty [to act] with due regard for the safety of all persons," and (2) contained no indication that the legislature intended to retain a preexisting duty of care, as reflected in the proviso in § 14-283 (d) that the emergency provisions "shall not relieve" the operator of that duty of care. Second, the majority ignores the vast and fundamental difference between the claim of negligence in *Coley*, which involved a plaintiff's effort to impose on a police officer an *affirmative* duty of care to protect the plaintiff from the risk of harm posed by a third person, and the traditional claim of negligence in the present case predicated on the officer's own negligent conduct that creates or increases a risk of harm. Compare *Murdock* v. *Croughwell*, 268 Conn. 559, 566, 848 A.2d 363 (2004) ("[T]here generally is no duty that obligates one party to aid or to protect another party. See 2 Restatement (Second), Torts § 314, p. 116 (1965)." (Internal quotation marks omitted.)), with 1 Restatement (Third), Torts, Liability for Physical and Emotional Harm § 7 (a), p. 77 (2010) ("[a]n actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm").

[67] For the same reason, I defer any discussion of the out-of-state case law bearing on the "decision/operation" distinction until we are confronted with a case that requires us to determine the soundness and viability of that distinction. Although the Chief Justice's concurring opinion engages in its own extensive discussion of some of the relevant case law, I will not respond with my own examination of these (and other) out-of-state cases because the discussion strikes me as unnecessary in the present case, in light of the fact that the plaintiff's claims, as construed by my colleagues, do not purport to involve the manner in which the pursuit was conducted, i.e., the negligent operation of the vehicle.

[68] This court previously has recognized that the legislature was well aware of the identifiable victim, imminent harm exception when it enacted § 52-557n. See *Grady* v. *Somers*, 294 Conn. 324, 344–46, 984 A.2d 684 (2009).

[69] Strictly speaking, of course, no child in Connecticut is legally compelled to attend public school, so long as the child receives "equivalent instruction in the studies taught in the public schools." General Statutes § 10-184.

[70] An affirmative duty to protect a person in the defendant's custodial care does exist under the law of torts. See, e.g., *Doe* v. *Saint Francis Hospital & Medical Center*, 309 Conn. 146, 181–82, 72 A.3d 929 (2013) ("[An] exception to the general rule that a defendant has no obligation to aid or protect

another person arises when a special relation exists between the actor and the other which gives to the other a right of protection. . . . Certain custodial relationships fall within this exception . . . . Under this exception, one who takes custody of another person may have a duty to protect that person from the intentional misconduct of a third person." (Citation omitted; footnote omitted; internal quotation marks omitted.)); 2 Restatement (Third), Torts, Liability for Physical and Emotional Harm § 40 (b), pp. 39–40 (2012) (imposing affirmative duty of care on, among others, custodians, including school personnel, under specified conditions). The principles animating this doctrine, however, are not the same as those underlying the identifiable victim, imminent harm doctrine.

[71] This concern persists for good reason. See *Torres* v. *Norwalk*, Superior Court, judicial district of Stamford-Norwalk, Docket No. FST-CV-16-6029691-S (May 2, 2018) (66 Conn. L. Rptr. 548, 562 n.16) (providing six examples of police pursuits in Connecticut that ended in crashes between 2016 and 2018).

[72] The identifiable victim, imminent harm doctrine is an exception to the immunity rule for municipal employees performing discretionary functions, which itself is an exception to the common-law (now codified) liability rule historically applicable to municipal employees. In other words, the Chief Justice's concurring opinion proposes an exception to the exception to the exception. Although this proposed arrangement is not definitive proof that the doctrine has run amuck, it is a strong indication that our immunity rules have been overtaken by an impractical degree of complexity and confusion.

[73] Under the wrongful conduct rule, the *driver* of the pursued vehicle may be prohibited from tort recovery by virtue of his unlawful flight from the police. See *Greenwald* v. *Van Handel*, supra, 311 Conn. 385.

[74] It seems doubtful that the officers were unaware of the passengers in the open convertible, which Officer Renaldi watched as it drove past him. In any event, his state of knowledge was for the jury to decide.

[75] For policy reasons, the Michigan court "place[d] on the plaintiff the burden of proving that a passenger was an innocent person and that the police therefore owed the passenger a duty." *Robinson* v. *Detroit*, supra, 462 Mich. 452.

[76] *Robinson* upheld the trial court's order rendering summary judgment in favor the individual officers on causation grounds—an issue not before us in the present case. The relevant statutes and case law in Michigan, moreover, demonstrate why we must be cautious before using out-of-state cases to derive the public policy in Connecticut. In contrast to our law, Michigan law waives municipal immunity in this context only when the officers' conduct amounts to *gross negligence* that operates as the *sole proximate cause* of a plaintiff's injuries. See *Robinson* v. *Detroit*, supra, 462 Mich. 460–63.

[77] *Fawcett* v. *Adreon*, Docket No. M2000-00940-COA-R3-CV, 2001 WL 950159 (Tenn. App. August 21, 2001), relies on a provision in Tennessee's emergency vehicle statute, conspicuously absent from General Statutes § 14-283, that expressly forecloses liability for "any injury proximately or indirectly caused to an actual or *suspected violator of a law or ordinance* who is fleeing pursuit by law enforcement personnel." (Emphasis added; internal quotation marks omitted.) Id., *3. The two other cases cited by the Chief Justice rest on what appears to me to be overblown rhetoric, devoid of empirical basis, expressing the view that, because police officers are "our thin blue line protecting society," it would be unfair and impractical to impose the burden on those officers to ascertain whether their vehicular pursuit would endanger innocent passengers. *Fisher* v. *Miami-Dade County*, 883 So. 2d 335, 337 (Fla. App. 2004), review denied, 901 So. 2d 873 (Fla. 2005); see also *Ombres* v. *Palm Beach Gardens*, 788 Fed. Appx. 665, 668–69 (11th Cir. 2019) (following *Fisher* under Florida law). As previously discussed, the Connecticut legislature has arrived at the opposite public policy determination when it comes to emergency police pursuits.